Douglas Huff **FLORES**, Appellant

v.

The **STATE** of Texas, Appellee.

No. 14–03–01379–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 23, 2005.

---

18. *See* Tex. Penal Code Ann. § 12.42(d) (Vernon Supp.2004–05) (providing the "three strikes" law).

19. *See* Tex.R.App. P. 44.2(a).

20. *See* Tex.R.App. P. 44.2(b).

Clay S. Conrad, Houston, for appellant.

Lori DeAngelo Fix, Houston, for appellee.

Panel consists of Justices ANDERSON, FROST, and SEYMORE.

## OPINION

JOHN S. ANDERSON, Justice.

Following the denial of his motion to suppress, appellant pled guilty to the offense of possession of marihuana weighing more than fifty pounds and less than two thousand pounds. In accordance with the terms of a plea bargain agreement with the State, the trial court sentenced appellant to confinement for nine years in the Texas Department of Criminal Justice, Institutional Division. In a single point of error, appellant argues the trial court abused its discretion in denying his motion to suppress. We conclude the trial court should have suppressed the marihuana discovered during the warrantless search of appellant's home. Accordingly, we reverse and remand.

MOTION TO SUPPRESS

Prior to entering a guilty plea, appellant filed a motion to suppress seeking to have all evidence discovered as a fruit of the warrantless search of his home suppressed pursuant to the Fourth Amendment of the United States Constitution, Article I, Section 9 of the Texas Constitution, and article 38.23 of the Texas Code of Criminal Procedure. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005). After an oral hearing, the trial court denied appellant's motion. Appellant subsequently entered a guilty plea and filed a notice of appeal.[1] We review whether the trial court abused its discretion in denying appellant's motion to suppress.

### A. The Hearing

At the motion-to-suppress hearing, the parties stipulated the search was made without a warrant. The relevant facts from the motion-to-suppress hearing are as follows:

On January 21, 2002, Deputy James A. Savell of the narcotics task force team of the Harris County Sheriff's Department received a "narcotics tip or clue call, [from an] anonymous person [who] called into [the] office, indicating that there was a person at [the address of] 812 English, who was involved in the sale of narcotics, specifically, large amounts of marijuana."[2]

---

1. At the time of his plea, appellant had signed a written waiver of his right to appeal, and this court initially dismissed his appeal. *See Flores v. State*, No. 14–02–00560–CR, 2002 WL 1899920 (Tex.App.-Houston [14th Dist.] Aug. 15, 2002, no pet.) (not designated for publication). Appellant then filed an application for writ of habeas corpus alleging his plea was involuntary because he had been told that he could appeal the denial of the motion to suppress and he would not have entered a guilty plea otherwise. The Texas Court of Criminal Appeals granted appellant's

request for habeas corpus relief. *See Ex parte Flores*, No. 74778, 2003 WL 22348943 (Tex. Crim.App. Oct. 15, 2003) (not designated for publication).

2. Upon being cross-examined about the anonymous tip, Savell explained:

"[H]e had one anonymous tip in regards to this residence the night prior to this incident. The same informant gave another tip which led to the arrest of a suspect in over 50 burglaries in another case. So, it's the same

On January 22, 2002, Savell contacted Sergeants Donald Pierce and Robert Barber, both members of the narcotics enforcement team of the Harris County Sheriff's Department, and informed them of the tip. The three officers met and proceeded to 812 English in three separate marked patrol cars; all three officers were in uniform. Around 4:00 p.m. or 5:00 p.m., the officers arrived at 812 English, a single story residence in a middle class neighborhood. Savell went to the front door and knocked, and a woman answered the door. Savell asked the woman who was in the residence at the time, and she stated her son and grandson were home. She told Savell her son's name was Douglas Flores, appellant. Savell asked to speak to him. She told him appellant was in the garage and went back inside the house to get appellant.

Savell did not wait at the front door for appellant's mother to return and instead walked with Sergeant Pierce around the corner of the house, back towards the garage. Sergeant Barber already had positioned himself where he could see the back of the house. All three officers proceeded toward the back of the house where appellant's mother had indicated appellant was located. They walked down the driveway toward the garage. Savell did not go through any fencing to get to the back area of the house. The officers then saw appellant exit the rear of the residence, and Savell asked appellant his name. Appellant was cooperative and identified himself. Savell described appellant as appearing apprehensive.

Savell told appellant he needed to talk about a narcotics investigation and asked

him if he would come to the front yard with the officers. Appellant accompanied the officers to the front of the house. At the front of the house, Savell told appellant he had gotten information appellant was selling large quantities of marihuana from his residence. Appellant denied it. Pierce asked appellant for consent to search his residence. Appellant did not consent.

Pierce then indicated to Savell they needed to secure appellant, "for his safety, as well as ours, and [they] were going to weigh out some options as far as continuing the investigation." According to Savell, appellant was detained to maintain the status quo. It was Savell's experience that people who are suspected of dealing large amounts of narcotics often carry weapons. Consequently, for officer safety, appellant was patted down prior to being placed in the back of the patrol car. As Savell patted appellant down, he "immediately recognized an item similar to being a bag containing a course [sic] leafy substance in [appellant's] front right pants pocket." Savell's experience led him to recognize the item as being consistent with a bag of marihuana. Savell removed the item from appellant's pocket and discovered it was a bag of marihuana.

Appellant was handcuffed and seated in the rear of a patrol car. Savell told appellant he was not under arrest, they were conducting an investigation, and someone would return to talk to him in a minute. Appellant was not given *Miranda* warnings.[3] According to Savell, appellant was handcuffed and placed in the back of the patrol car "[s]o [appellant] could be in a secure place ... not roaming around the scene or trying to make contact or trying

---

informant. So, this is an informant that I've used in the past and he's been reliable.... Its anonymous for the purpose of this report. If you'll read in my report, it says on here that the persons providing the information wish to

remain anonymous, for reasons of personal safety."

**3.** *See Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

to regain entry into the house, keep him from contaminating the investigation, basically."

Appellant's mother came out of the house and asked to talk to one of the officers. Pierce spoke to her briefly. Savell then went back to the patrol car and opened the door where appellant was seated. Appellant asked to speak to his mother; Pierce brought her over to the car. Appellant spoke with his mother. Savell was not privy to the substance of their conversation.

Pierce spoke to appellant about his options. Appellant then signed a written consent for search of his property. Savell witnessed appellant reading and signing the consent form. When questioned about appellant's consent to the search, Savell replied:

> Yes.... It was our—my opinion, at that point, when we were talking to him in the vehicle, that we would have enough evidence, provided we could get a canine unit to come out and assist, that we had enough evidence for a search warrant. So, there was no need to try to coerce him or threaten him into signing this consent. The only thing that the consent did for us was eliminate a couple of hours of our time.

Savell had spent about ten to fifteen minutes with appellant before he signed the consent form.

After signing the consent form, appellant told Savell he had marihuana in his garage. Appellant asked to be present during the search; handcuffed, appellant accompanied the officers in their search. Appellant told the officers how to open the garage door. Savell smelled a strong odor of marihuana within a few feet of the garage door, and when the door was opened, he saw some blankets covering some objects in the back of the garage. The objects were sixty-five bundles of marihuana, weight scales, cellophane wrapping paper, duck tape, axle grease, saws, and cutting saws, items used for packaging and repackaging bundles of marihuana. During the search, appellant sat in the front of the garage and watched. Marihuana also was found inside the house.

Sergeant Pierce next testified at the motion-to-suppress hearing as to his recollection of the events of January 22, 2002. Pierce accompanied Savell and Barber to appellant's residence at 812 English, and he went to the front door with Savell. Appellant's mother opened the door and in response to questioning told them appellant and her grandson lived there. After she said appellant was in the garage, Pierce walked down the side of the house and saw appellant emerging from the back door. The officers and appellant then walked to the front of the residence. Savell informed appellant that officers had received information about narcotic traffic at his residence. At this point, appellant did not consent to a search.

Pierce told Savell to secure appellant in the back of the patrol car for officer safety "[b]ecause weapons and narcotics go hand in hand." Savell patted appellant down for weapons, and, during the pat-down, Savell found a bag of marihuana. Appellant was handcuffed and placed in the back of a patrol car.

Pierce went to speak with appellant's mother and asked her who had care, custody, and control of the residence. She told him that she lived in the residence with appellant and her grandson. She also stated appellant paid the rent. Pierce then approached appellant and asked him if he was sure that he did not want to give consent. Pierce also told appellant that it would be necessary to secure the residence if appellant did not consent to a search. Pierce explained securing the residence

meant appellant's mother and son would have to exit the house. Pierce had to make sure no one else was in the house. Appellant told Pierce he would sign the consent form, but first, he wanted to speak to his mother. Pierce brought appellant's mother over to speak to him, but Pierce did not know what they said. Subsequently, appellant signed a written consent to search.

Appellant accompanied the officers when they searched the garage. Appellant told Pierce the marihuana was in the back of the garage. Some marihuana also was found in a bedroom, and a small amount of cocaine was recovered.

Sergeant Barber also testified at the motion-to-suppress hearing. Barber testified that when he, Pierce, and Savell arrived at appellant's residence, he walked around to the side of the house to make sure it was safe in the back and to prevent anyone from escaping through the back door. Pierce and Savell knocked on the front door. Barber testified he did not go through the backyard fence. He saw appellant exit the back of the residence, and, when appellant was asked by the officers to come over and talk, he was cooperative. Pierce and Savell spoke with appellant while Barber maintained security around the residence. Barber was present when appellant signed the consent to search.

Appellant was the last witness to testify regarding what transpired on January 22, 2002. Appellant was watching television when his mother answered a knock at the door. His mother told him an officer wanted to talk to him and that they were going to the back, so appellant intended to meet them in the back by going out the back door. When he went outside, two officers were in his back yard. To get to his back yard, the officers had to go through the driveway and open the gate to his back yard. One officer was looking in

the wash room, and appellant asked if he could help him. The officer asked if he was Douglas Flores, and appellant replied affirmatively. The officer told appellant they needed to talk and asked him to accompany them to the front of the residence. Appellant complied; appellant did not feel he had a choice.

After returning to the front of the residence, appellant was asked whether he had marihuana in his garage, and appellant said he did not. The officer asked appellant if officers could search the garage. Appellant replied "no" and asked the officers if they had a warrant. One officer said he did not have a warrant, but he would get one.

Appellant was searched and placed in the back of a patrol car. Appellant described the search of his person. When the officer approached, appellant told him that he had a small pocket knife. The officer took the pocket knife out of appellant's pocket. The officer placed his fingers in appellant's pockets during the search and pulled a small bag of marihuana from a small front pocket of his pants. One of the officers informed appellant that he would be placed in the back of the patrol car until a warrant was issued. Appellant was handcuffed and placed in the back of the patrol car.

While in the back of the patrol car, an officer asked appellant to sign a written consent; appellant replied that *"[he'd] rather see the warrant."* The officer directed another officer to bring appellant's mother out of the house. Appellant thought the officer was going "to take" his mother. Consequently, appellant told the officer that he would sign the consent form if the officers allowed his mother to go back inside the house. Appellant signed the consent form and told the officers that there was marihuana in the garage. Appellant admitted that the officers never

had their guns out or threatened or raised a hand to appellant or his mother.

After considering the arguments of counsel and the evidence, the trial court denied appellant's motion to suppress.

## B. Standard of Review

■■■ We review the trial court's ruling on a motion to suppress evidence under an abuse of discretion standard. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). If supported by the record, a trial court's ruling on a motion to suppress will not be overturned. *Hill v. State*, 902 S.W.2d 57, 59 (Tex.App.-Houston [1st Dist.] 1995, pet. ref'd). At a suppression hearing, the trial judge is the sole finder of facts. *Arnold v. State*, 873 S.W.2d 27, 34 (Tex.Crim.App.1993); *Hill*, 902 S.W.2d at 59. We give almost total deference to the trial court's determination of historical facts that the record supports, especially when the trial court's findings turn on evaluating a witness' credibility and demeanor. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App.2000); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App.2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim.App.1997). We give the same amount of deference to the trial court's ruling on mixed questions of law and fact if the question is resolved by evaluating credibility and demeanor. *Ross*, 32 S.W.3d at 856. We consider *de novo* issues that are purely questions of law. *Id.* If the trial court's ruling is reasonably supported by the record and is correct on any theory of law applicable to the case, the reviewing court will sustain it upon review. *Villarreal*, 935 S.W.2d at 138.

In the case at bar, the trial court did not make explicit findings of historical facts. We therefore review the evidence in a light most favorable to the trial court's ruling. *See Carmouche*, 10 S.W.3d at 327–28. We assume the trial court made implicit findings of fact supported in the record that buttress its conclusion. *See id.* at 328. We review *de novo* the lower court's application of the relevant Fourth Amendment standards. *See id.*

## C. The Voluntariness of Appellant's Consent

Appellant argues the trial court abused its discretion in overruling his motion to suppress because his written consent to search was (1) the fruit of unattenuated illegal police activities; and (2) involuntary because it was the product of duress and coercion.[4]

■■■ We first address appellant's contention that his consent was the product of duress and coercion. Appellant argues the totality of the circumstances show he did not give consent voluntarily because he did not consent until after (1) being handcuffed and locked in a police car; (2) being subjected to coercive police procedures;[5] (3) twice declining the officers' request for consent to search; (4) acquiescing to a search after being told his mother and son

4. Questions of voluntariness and attenuation of taint are closely related; however, an attenuation analysis is logically distinct from one involving only questions of voluntariness. *Arcila v. State*, 834 S.W.2d 357, 358–59 (Tex. Crim.App.1992), *overruled on other grounds*, *Guzman v. State*, 955 S.W.2d 85, 88–90 (Tex. Crim.App.1997); *Brick v. State*, 738 S.W.2d 676, 680–81 (Tex.Crim.App.1987).

5. Appellant details the coercive police procedures as follows: the officers' refusal to wait at the front door of appellant's residence for him and instead walking around to the back of the house; the officers' detaining him in the backyard and requesting consent to search, which appellant denied; the officers' search and arrest of appellant after he denied consent to search; and the officers' threats to appellant that if he did not consent to a search, his mother and young son would be detained and forced to wait outside while the police searched the house.

would be detained outdoors in January if he failed to do so; (5) being aware that incriminating evidence would be found; (6) being surrounded by at least three armed police officers; (7) being placed in a police car; (8) the officers telling appellant they believed he possessed a large quantity of marihuana; (9) the officers having previously been denied consent by appellant twice; and (10) the officers' failing to inform appellant of his right to refuse consent.

"At the core of the Fourth Amendment . . . is the fundamental concept that any governmental intrusion into an individual's residence or expectation of privacy must be strictly circumscribed." *Payton v. New York*, 445 U.S. 573, 582 n. 17, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Under the Fourth and Fourteenth Amendments, a search conducted without a warrant issued upon probable cause is " 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent, so long as the consent is voluntary. *Schneckloth*, 412 U.S. at 219–23, 93 S.Ct. 2041. The validity of a consent to search is a question of fact to be determined from all the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim.App.2002). The consent must "not be coerced, by explicit or implicit means,

by implied threat or covert force." *Schneckloth*, 412 U.S. at 228, 93 S.Ct. 2041; *see also Allridge v. State*, 850 S.W.2d 471, 493 (Tex.Crim.App.1991) ("The consent must be shown to be positive and unequivocal, and there must not be any duress or coercion."). By the same token, consent is not established by "showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (holding where officer falsely represented he had a valid search warrant, consent not voluntary). In determining the meaning of a voluntary consent, two competing concerns must be accommodated— the legitimate need for such searches and the equally important requirement of assuring the absence of coercion. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. In Texas, the State is required to prove the voluntariness of consent by clear and convincing evidence based on the totality of the circumstances.[6] *See Reasor v. State*, 12 S.W.3d 813, 818 (Tex.Crim.App.2000). In this case, the issue of consent does not turn upon an evaluation of credibility and demeanor, so it is subject to *de novo* review. *See Reyes–Perez v. State*, 45 S.W.3d 312, 316 (Tex.App.-Corpus Christi 2001, pet. ref'd).

In making a determination of voluntariness, courts consider various factors, including the following: whether the consenting person was in custody, whether he or she was arrested at gunpoint, whether he or she had the option of refusing consent, the constitutional advice given to the accused, the length of detention, the repetitiveness of the questioning, and the use of physical punishment. *See Laney v. State*, 76 S.W.3d 524, 532 (Tex.App.-Houston

**6.** In contrast, the federal constitution requires consent to be proven by a preponderance of the evidence. *See Maxwell*, 73 S.W.3d at 281. Because appellant challenged the voluntariness of his consent under both the federal and Texas constitutions, the State was required to show by clear and convincing evidence that appellant's consent was valid.

[14th Dist.] 2002), *aff'd,* 117 S.W.3d 854 (Tex.Crim.App.2003). Courts also consider the characteristics of the consenting person, including the person's youth, education, and intelligence. *Id.; see Reasor,* 12 S.W.3d at 818.[7] Additionally, "[w]hile a warning that an individual does not have to consent to a search and has the right to refuse is not required nor essential, the showing of a warning is of evidentiary value in determining whether a valid consent was given." *See Meeks v. State,* 692 S.W.2d 504, 510 (Tex.Crim.App.1985).

In this case, the trial court heard testimony from four witnesses at the hearing on the motion to suppress, three officers and appellant. Giving proper deference to the trial court's ruling, the circumstances surrounding appellant's consent to search may be summarized as follows:

- Savell received an uncorroborated anonymous tip, that a person at 812 English was involved in the sale of large amounts of marihuana.
- Three officers went to the above address to conduct a "knock and talk."
- Two officers knocked on the front door of 812 English, and appellant's mother answered. A third officer kept an eye on the back portion of the house.
- When appellant's mother went inside the house to get appellant, the officers did not wait for her to return but went around the side of the house to the backyard.
- When the officers approached the backyard, they saw appellant going out the back of the house; appellant identified himself and agreed to ac-

company the officers to the front of his house.

- Once at the front of the house and after being told by the officers that they received information he was selling large quantities of marihuana from his residence, appellant refused consent to a search of his residence.
- After appellant refused consent, to maintain the "status quo," the officers decided to detain him. Appellant was patted down for officer safety.
- During the pat-down, a small bag of marihuana was discovered in appellant's pocket.
- Appellant was handcuffed and seated in the back of a patrol car. Appellant was told he was not under arrest.
- Appellant was not given *Miranda* warnings.
- After appellant was handcuffed and sitting in the patrol car, one of the officers told him that his residence would be secured if he did not give consent to a search. Appellant was further informed that his mother and young child would be required to stay out of the house for security purposes.
- After appellant spoke to his mother, he signed a written consent to search.
- The officers did not physically threaten appellant.
- The consent form informed appellant that he had the "right not to have a search made of [his residence] without a search warrant" and a "right to voluntarily consent to such a search."
- After signing the written consent form, appellant told the officers he had marihuana in his garage, and he

---

7. The *Schneckloth* Court developed the standard by which consent is tested for voluntariness. 412 U.S. at 226, 93 S.Ct. 2041. In determining whether a defendant's will was overborne in a particular case, trial courts are to assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.*

accompanied the officers in their search of the garage, during which the officers discovered sixty-five bundles of marihuana.

- The time between the officers' arrival at appellant's residence and appellant's written consent was about ten to fifteen minutes.

We conclude that the totality of the circumstances, as outlined above, show appellant's consent was not freely and voluntarily given. Rather, appellant's consent was the result of coercive police tactics aimed at forcing appellant to consent to a search of his residence.

First, the officers knew they could not obtain a warrant to search appellant's residence solely based upon the anonymous tip because the tip, standing alone, did not establish probable cause. *See State v. Steelman,* 93 S.W.3d 102, 108 (Tex.Crim. App.2002) (holding anonymous tip, that someone at the residence was dealing drugs, did not amount to anything; the tip was never substantiated, and none of the occupants were ever charged with drug dealing); *see also Elardo v. State,* 163 S.W.3d 760, 768 (Tex.App.-Texarkana 2005, pet. ref'd) ("[A] mere anonymous tip, standing alone, will not establish probable cause. The police can provide other indicia of reliability by independent corroboration of the informant's information. However, corroboration of only innocent details is usually insufficient." (citation and footnotes omitted)); *Parish v. State,* 939 S.W.2d 201, 203 (Tex.App.-Austin 1997, no pet.) ("[A]nonymously provided information must contain some indicia of reliability or be 'reasonably corroborated' by police before it can be used to justify a search."). Here, the officers never made *any* attempt to corroborate the information provided in the tip; the officers did not conduct surveillance of the address or otherwise substantiate the tip. We also note that the tipster alleged an individual at appellant's home address was involved in the *sale* of large amounts of marihuana; appellant was not charged with selling drugs but with *possession*. Due to the inadequacy of the tip, the officers' only lawful means of a warrantless search of appellant's residence was by obtaining appellant's consent, and it was apparent from the moment the officers arrived that this was their goal.

█ Additionally, the anonymous tip did not establish reasonable suspicion to justify the pat-down search of appellant. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (stating reasonable suspicion is dependent on both the content of the information possessed by police and its degree of reliability). "An anonymous telephone call may justify the initiation of an investigation, but ... alone, it will rarely establish the level of suspicion required to justify a detention." *Johnson v. State,* 146 S.W.3d 719, 721 (Tex.App.-Texarkana 2004, no pet.) ("Reasonable suspicion requires [an anonymous tip] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. When more information is available, however, a police officer may reasonably conclude the tip is reliable, thus justifying an investigatory detention." (citations omitted)). Savell explained he patted appellant down for officer safety, based on his experience that people who are suspected of dealing large amounts of narcotics often carry weapons. However, there was no independent corroboration of the tip to substantiate the presence of narcotics at the residence nor any information indicating the tip had sufficient indicia of reliability. Consequently, the officer's fear of weapons was unfounded, and, thus, the subsequent pat-down search of appellant's person was unjustified. This coercive tactic is what led to the discovery of marihuana on appellant's person, thereby

providing the officers with the requisite probable cause they needed to arrest appellant.

 The coercive nature of appellant's consent is further evidenced by the officers' failure to read appellant his *Miranda* rights upon his arrest. Whether police give a defendant *Miranda* warnings is a factor relevant to consent. *Gallups v. State*, 104 S.W.3d 361, 366 (Tex.App.-Dallas 2003), *aff'd*, 151 S.W.3d 196 (Tex.Crim. App.2004). Appellant was under arrest when he was handcuffed and placed in the back of the patrol car subsequent to the officer's discovery of a small bag of marihuana on his person during the unlawful pat-down search. *See* TEX.CODE CRIM. PROC. ANN. art. 14.01(b) (Vernon 2005) ("A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view."); *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602 (stating for *Miranda* rights to be necessary, a police interrogation must be custodial; the questions must be asked after the suspect has been taken into custody or otherwise deprived of freedom of action in a significant way). In their haste to obtain appellant's consent to search his residence, the officers did not read appellant his *Miranda* rights when he was arrested or before he gave written consent to search. The officers' failure to give appellant *Miranda* warnings is a factor indicating appellant's consent was the product of duress and coercion.

Finally, in a last ditch effort to obtain consent to search the house, and, while appellant was handcuffed in the back of the patrol car, the officers told him that if he did not consent, his mother and young son would be required to vacate the house while the officers secured the residence, despite the officers having no basis for doing so. After this threat was made, appellant spoke to his mother; appellant then agreed to sign the written consent to search. The officers' threats to remove appellant's family from the residence are what lead appellant ultimately to consent to a search of his residence. Such antagonistic action by the police against a suspect's family is a factor which significantly undermines the voluntariness of any subsequent consent given by the suspect. *See United States v. Ivy*, 165 F.3d 397, 403–04 (6th Cir.1998) (holding consent invalid where defendant threatened by officer that everyone in the house would go to jail if he did not sign consent form); *United States v. Bolin*, 514 F.2d 554, 560–61 (7th Cir. 1975) (holding consent invalid where defendant signed consent form while undergoing custodial interrogation and only after he had been impliedly threatened that his girlfriend would be arrested if he did not sign).

Given the totality of the circumstances, the State did not meet its burden of proving by clear and convincing evidence that appellant's consent was freely and voluntarily given. The coercive conduct surrounding appellant's consent leads to only one conclusion, that appellant's consent was involuntary and his will was overcome. Thus, appellant's consent was invalid. Because the State has not argued that the search was supported by probable cause and a warrant or any other recognized exception to the warrant requirement, no other grounds to legitimize the search may be upheld.

We hold the trial court abused its discretion in denying appellant's motion to suppress because appellant's consent was involuntary and the product of duress and coercion. Thus, the search of appellant's residence was unreasonable under the Fourth Amendment, rendering the seized contraband the inadmissible fruit of that unlawful activity.

Accordingly, we sustain this part of point one. We need not address appellant's alternative argument that his consent was invalid because it was the product of unattenuated illegal official acts.

CONCLUSION

We reverse and remand for further proceedings consistent with this opinion.