

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-13-00180-CR
_____

ANTHONY G. HEREFORD, JR., APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

On Appeal from the 140th District Court
Lubbock County, Texas
Trial Court No. 2007-416,291, Honorable Jim Bob Darnell, Presiding

_____

September 8, 2014

## OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Anthony G. Hereford, Jr., appeals his conviction for possessing a controlled substance (cocaine) and the accompanying seventy-five year prison sentence. His two issues involve the admission of evidence. Through the first, he contends that the trial court erred in allowing a police officer to repeat an accusation uttered against him in a 911 call by an un-named person. The evidence was hearsay, and the decision to admit it allegedly denied him his constitutional right to confront witnesses. Via his second issue, appellant asserts that the trial court erred in admitting, during the punishment

phase of the trial, a newspaper clipping found in his wallet.  We sustain the first issue

and reverse.

*Issue 1—Information by Unknown Informant*

The trial began with the prosecutor making her opening statement.  Immediately

after her greeting, she told the jurors:

> March 24th, 2007, there's a phone call that comes in to 9-1-1, or to dispatch. And the person on the other line wishes to remain anonymous, and they give . . . A call comes in to LPD and they're informed that an individual by the name of Anthony Hereford, Jr. is staying at the Villa Inn and that he is involved in some activity that the caller . . . And the caller states that the person . . . identified as Anthony Hereford, Jr., is trafficking narcotics out of his room at the Villa Inn motel. They [sic] identify the room number as 230, and so officers respond.

Shortly thereafter, the State called its first witness, a police officer who responded to the

call mentioned in the opening statement.  That officer was asked to describe the data

normally contained in a "callout" from the dispatcher.  He answered with the following:

> Things that might be included are, of course, the address on where you're going to be, if you're supposed to meet with a person, vehicle description, description of a person, maybe a name of a person, or something specifically you're supposed to be looking for.

That led to the officer being asked:  "What was the basic information that you were

given when you were dispatched?"  He answered:

> The information we were given was that there was a person who was dealing narcotics out of Room 230 at the Villa Inn, which is 5401 South Q Drive, and that subject's name was Anthony Hereford.

Several  more  questions  were  asked  about  what  the  officer  did  upon  hearing  the

dispatch and arriving at the motel.  Apparently, he saw a woman (Vanessa Sosa) scurry

into the room when he and his partner appeared.  At that point, the State asked:  "Can you explain to [the] jury then whenever you're having an encounter like that, how does that typically go *with a suspect*?"  (Emphasis added).  And, the witness replied:

> We knocked on the door -- in any case you're going to knock on the door. You're going to let them know who you are and why you're there. We told them that *we received lots of calls about people coming in and out of the room, there was a possibility of trafficking narcotics --*

(Emphasis added).[1]

The second officer responding to the dispatch also appeared as a witness at the trial.  He too was asked about the nature of the "callout" or dispatch to the Villa Inn and testified that "[w]e received a call that Mr. Hereford may be dealing narcotics out of Room 230 at the Villa Inn."  Following that answer, the State asked: "And it was specifically Anthony Hereford; is that correct?"  The witness said "[t]hat's correct."  The State then pointed out that "they gave you a specific name, and they also gave you a specific room number; is that correct?"  The officer answered:  "Yes, ma'am."

Then inquiry was made about whether it "lend[s] to [the] credibility" of the caller that "specific details" were provided.  That inquiry was met with the officer saying: "Absolutely. A substantial part of -- a number of the complaints don't have specifics like this called in, so I believed it was fairly credible from the start."[2]

---

[1] We found nothing of record indicating that the police "received lots of calls" concerning people entering and leaving room 230.  Nor did our review of the record disclose the identity of the people placing those "lots of calls" or the time when they were supposedly made.

[2] The specificity of the information provided in an anonymous tip often plays a role in assessing the legitimacy of a subsequent search and seizure.  *See e.g.*, *Flores v. State*, 172 S.W.3d 742, 751 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  Yet, the propriety of the officers' encounter with and arrest of appellant and search of the hotel room went unquestioned at trial.  Nor does the appellate record reveal that appellant urged any Fourth Amendment violation before trial began.   And, while the State argued that admission of the call was permissible to explain why the officers appeared at the scene (*i.e.,* background), we are left asking why bolstering the un-named informant's credibility is pertinent to that matter.  On the other hand, so bolstering the credibility of the tipster could certainly induce a fact finder to believe that the substance of what was being said was accurate or truthful.

In addition to the two live witnesses testifying about the substance of the unidentified informant's tip, other evidence about someone placing a call to the police was entered via an electronic format. It consisted of the trial court permitting the State to play a video to the jury. In that video, an officer can be heard interrogating appellant and Sosa after their arrest and while seated in the police car. During that interrogation, the officer said such things as 1) "why is *he* selling crack out of there," 2) "we got a report . . . [that] somebody's selling drugs out of that room," and 3) "we go in there and find a bunch of crack." (Emphasis added).

Who made the purported 911 call went unmentioned. When it was made appears nowhere in the record, either. Nor does the record indicate that the purported caller appeared at appellant's trial. Instead, the officers simply reiterated what the person allegedly said when placing the call, and one of the witnesses vouched for the credibility of that unknown caller. More importantly, before the jury was allowed to hear the foregoing evidence, appellant objected to its admission because it was hearsay and its use violated his constitutional right to confront witnesses testifying against him.

We further observe that upon conclusion of the guilt/innocence phase of the trial, the trial court instructed the jury of the accusations against appellant and its obligation to determine if he was guilty of either accusation. One of the two accusations simply involved appellant's possession of a controlled substance. Through the other, though, the jurors were asked to decide if appellant possessed the controlled substance with the "intent to deliver." Those jurors found him "guilty of the offense of possession with intent to deliver . . . ." Judgment was later entered upon that verdict.

We are asked to hold that the trial court erred in admitting evidence of the substance of the 911 call for the reasons expressed below. We sustain the request.

4

*Right to Confront*

Per the Sixth Amendment to the United States Constitution, an accused "shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. A similar right appears in the Texas Constitution. Tex. Const. art. 1, § 10. (stating that the accused "shall be confronted by the witnesses against him . . . ."). The essential purpose of that right "'is to secure for the opponent the opportunity of cross-examination[,]' because that is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Johnson v. State*, 433 S.W.3d 546, 551 (Tex. Crim. App. 2014), *quoting*, *Davis v. Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)). Though there are a myriad of ways by which one can be denied the right, the mode relevant here concerns the reiteration at trial of statements uttered by an unknown third person and accusing appellant of criminal activity. The question for us is whether those statements are testimonial or not.

"[O]ut-of-court statements offered against the accused that are 'testimonial' in nature are objectionable [under the Constitution] unless the prosecution can show that the out-of-court declarant is presently unavailable to testify in court and the accused had a prior opportunity to cross-examine him." *Langham v. State*, 305 S.W.3d 568, 575-76 (Tex. Crim. App. 2010). Whether the statements are "testimonial" is a question of law, which we consider *de novo*. *Id.* at 576; *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).[3]

---

[3] Because the question is one of law and reviewed *de novo*, we reject the implicit suggestion in the State's brief that we should defer to the lower court's ruling. The United States Supreme Court may have "expressed its confidence in [the] trial courts' ability to determine both when statements in response to interrogations evolve from non-testimonial to testimonial." But, if whether they are testimonial or not is a question of law in Texas (as it truly is) the "confidence" vested in such courts by the U.S. Supreme Court is of little import.

5

We have not been afforded an explicit definition of "testimonial." *See Wall v. State*, 184 S.W.3d 730, 734 (Tex. Crim. App. 2006) (noting that the United States Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) declined to provide a comprehensive definition of the term). Yet, as recognized in *Wall*, guidance was given us in the form of examples of what falls within the category. They include 1) ex parte in-court testimony or the functional equivalent, such as affidavits, custodial examinations, or prior testimony, 2) pretrial statements that a declarant would expect to be used in a prosecution, 3) extrajudicial statements in formalized materials such as affidavits, depositions, prior testimony, or confessions, and 4) statements made under circumstances that would lead an objective witness to believe it would be used in a future judicial proceeding. *Langham v. State*, 305 S.W.3d at 576. Furthermore, the opinion in *Langham* is of particular help to us in determining to which category, if any, the contents of the alleged 911 call likens.[4]

In *Langham*, an officer was permitted to testify before the jury about what a confidential informant told him. The subject of the disclosure concerned drug activities purportedly occurring in a house that Langham shared with her boyfriend and others. According to the officer, his informant told him of the house's specific address, the name of a male selling the drugs (Spyder), and the description of the female (Langham) "'*that was also involved.*'" *Id.* at 572. (Emphasis in original). The officer then used the

---

[4] We say alleged 911 call because the State did not offer a recording or transcription of it into evidence. Nor did they call the person who actually heard it as a witness. Instead, someone else apparently told the two officers about it, and those officers reiterated its supposed content at trial. And, experience tells us that the content of a message can change as it verbally passes from one person to another to another. Indeed, the record illustrates as much here. Initially, the officers testified to one anonymous call being made. However, in their later conversations with appellant, they tell him of receiving "lots of calls" about the activity occurring in the motel room. From one call to "lots" is quite a substantive change in what actually was said to them. And, of course, being patrol officers responding to directives from a dispatcher, they received no "calls" themselves and could only reiterate what was told them by who knows how many people up the chain of communication.

information to secure a search warrant. Upon execution of the warrant by law enforcement officials, Spyder and Langham were found at the abode along with trace amounts of cocaine.

Langham objected to the admission of the statements imparted by the informant, averring that they constituted hearsay and violated her right to confront witnesses proffering evidence against her. The trial court overruled the objection, which ruling the intermediate court of appeals affirmed. Both of those courts characterized the informant's comments as non-testimonial. Our Court of Criminal Appeals then considered the issue and began its analysis by saying that "we look to determine whether 'the surrounding circumstances objectively indicate that the primary purpose'" of the exchange between the officer and informant was "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 576. For instance, if the primary purpose was to gather information to address an emergency, then the incriminating information may not be testimonial. *Id.* at 579. If, however, there exists no emergency or the circumstances creating the emergency have been ameliorated, then the primary purpose of the exchange may morph into developing "a factual predicate for later litigation" or investigating a crime. *Id.* And, should the exchange so morph, then the statements become testimonial. *Id.* In utilizing this framework, the Court of Criminal Appeals held that the informant's revelations were testimonial. *Id.* at 580.

"Information that cocaine was being peddled from the residence at 5301 Encino, as the confidential informant asserted, was unquestionably relevant to the subsequent prosecution of anyone who was involved in that activity," observed the Court. *Id.* at 579. It further observed that the officer's primary purpose in garnering the information "was to apprehend and eventually prosecute those in the residence who were involved (and the

7

confidential informant specifically asserted that the appellant 'was also involved') in the illegal enterprise." *Id.* With the teachings of *Langham* in mind, we turn to the cause before us.

We do not know the extent of the exchange between the unknown or anonymous caller and the 911 operator who spoke with that person. Again, neither a recording nor transcription of the conversation appears of record. Instead, we have only a reiteration by the officers of what they were told about the exchange. And, much like the situation in *Langham*, the officers testified about being told of a specific person selling drugs at a specific location. One cannot reasonably infer from that rather sparse verbiage that the caller was seeking help or was otherwise facing some immediate threat to his or her safety or well-being. *See Davis v. Washington*, 547 U.S. 813, 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (concluding that the statements contained in the 911 call were non-testimonial because they were describing ongoing conduct, the "call was plainly a call for help against a bona fide physical threat," and the elicited statements "were necessary to be able to *resolve* the present emergency . . . .") (Emphasis in original). From what was said by the officers, we can only conclude that the informant here, like the informant in *Langham*, was simply reporting the occurrence of a crime, which crime the officers were subsequently dispatched to investigate. *See id.* (recognizing that someone may "call 911 to provide a narrative report of a crime absent imminent danger").

The similarities between the material aspects of the call in *Langham* and here cannot be ignored. Upon coupling that with the absence of any indicia suggesting the presence of some emergency, we have no choice but to arrive at the same outcome as that in *Langham*. The primary, if not sole, purpose of the terse exchange at bar was for

8

the purpose of developing "a factual predicate for later litigation" or investigating a crime. So, the anonymous statements reiterated by the police were testimonial.[5]

We note the State's attempt to justify admission of the statements at trial by characterizing them as needed to set the background or explain to the jury why the police appeared at the motel. That argument was also made in *Langham*. So too was it rejected. As stated by that Court, "the relevance of 'background' evidence is marginal to begin with . . . ." *Langham v. State*, 305 S.W.3d at 580. Furthermore, "the introduction of too much incriminating detail may, whenever the evidence has some objectionable quality not related to its marginal relevance, prove far more prejudicial than probative." *Id.* Even when an "out-of-court statement showing 'background' is not *offered* for the truth of the matter asserted, its probative value to place other, more direct evidence in an understandable context will usually be slight compared to its tendency to cause the jury to consider it for that improper, truth-of-the-matter-asserted purpose." *Id.* (Emphasis in original). "And the greater and more damning the detail contained in that out-of-court statement, the greater the likelihood that the jury will gravitate toward the improper use." *Id.* For this "reason . . . courts have practiced caution in declaring testimonial out-of-court statements . . . to be admissible as 'background' evidence: too much damning information will erode judicial confidence that

---

[5] The State seems to place much emphasis on the language in *Crawford v. Washington,* 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) and its progeny describing testimonial statements as those which tend to prove or establish "past" acts or events related to crime. It urged that the utterances here "were to obtain police assistance for an ongoing crime, not to describe past events potentially relevant to later criminal prosecution," which supposedly made them non-testimonial. Yet, *Langham* did not involve past acts but rather the accusation of on-going criminal activity. So, whether the call or tip or disclosure described historical or current activities is determinative. If the information is simply laying a factual predicate for later litigation or simply imparted to induce law enforcement to investigate criminal activity, it is testimonial under *Langham*. *Langham v. State*, 305 S.W.3d 568, 579 (Tex. Crim. App. 2010) (stating that "as long as the emergency situation is still ongoing, the 'primary purpose' of the communication is not to develop a factual predicate for later litigation"). Later litigation may encompass both a crime that occurred before the declarant spoke or one occurring as he spoke.

the accused has truly enjoyed his Sixth Amendment right to confront *all* of 'the witnesses against him[.]'" *Id.* (Emphasis in original).

Again, like the situation in *Langham*, the reiteration by the two police officers of the tipster's alleged statement "with respect to the criminal activities at [the motel], and [ ] appellant's 'involvement' in them, provided far greater detail than was reasonably necessary to explain why the police decided to investigate. . . ." *Id.* "The bare fact that [they] had obtained unspecified information justifying" an investigation at the locale "would readily have sufficed to serve this purpose," that is, set the background. *Id.* Indeed, the State in the cause before us conceded in its appellate brief that the statements "did not qualify as mere 'background' information" given their detailed nature. That the State began its prosecution by mentioning them in its opening statement, had two officers reiterate them, and then had one of the two vouch for the credibility of the unknown declarant is also telling. It intended to use them for more than mere background information.

In sum, the statements at issue were testimonial and used for the truth of the matter asserted. Because the State failed to show that the caller was unavailable to testify at trial and that appellant had a prior opportunity to cross-examine him or her, their admission over appellant's Sixth Amendment objection violated that amendment.

Having found error of a constitutional nature, we now turn to assessing whether it harmed appellant. In doing so, we apply the test found in Texas Rule of Appellate Procedure 44.2(a). It obligates us to reverse the judgment "unless the court determines beyond a reasonable doubt that the error did not contribute to [appellant's] conviction or punishment." TEX. R. APP. P. 44.2(a). This obligates us to assess the likelihood that the error was a contributing factor in the jury's deliberations and decision. *Langham v.*

10

*State*, 305 S.W.3d at 382. And, we make that assessment by considering such things as: 1) the statements' importance to victory by the State, 2) whether they were cumulative of other evidence, 3) the presence of admissible evidence corroborating or contradicting the out-of-court statement on material points, 4) the overall strength of the State's case, 5) the source and nature of the error, 6) the extent to which it was emphasized by the State, and 7) the weight the jury may have assigned the inadmissible statement. *Id.* at 582, *quoting*, *Scott v. State*, 227 S.W.3d 670 (Tex. Crim. App. 2007).

First, the record contained sufficient admissible evidence upon which a jury could have rationally concluded, beyond reasonable doubt, that appellant was a party to the crime of possessing a controlled substance with intent to deliver. Yet, we must remember that "when evidence is erroneously admitted in violation of . . . [one's right to confront witnesses], the question . . . is not whether the jury verdict was supported by the evidence, even discounting the erroneously admitted evidence." *Id.* at 582-83.

Second, whether appellant was the principal actor, rather than just a party, was less certain. As illustrated by the record, someone did appear at the scene with money in hand while the officers were present. Yet, the person did not ask for appellant, but for Sosa. To that, we add the observations that 1) no drugs were found on appellant, 2) appellant did not have a large sum of money on his person, 3) appellant consented to a search of the motel room and his car, 4) no drugs, money or other items connecting him to drug trafficking where found in his car, 5) Sosa chastised appellant for consenting to the search of the room, 6) Sosa physically possessed drugs and attempted to destroy/conceal them while none were found on appellant, and 7) Sosa possessed money. The foregoing combined with the tenor of her testimony and conduct on the

11

video of the arrest could lead one to reasonably infer that she, not appellant, controlled what was occurring in the motel room.

So too did the record disclose that appellant was told, at the scene, that he was being arrested for possessing crack. Nothing was said about him selling it. That is of import; while appellant could be seen in the video pleading with Sosa to accept responsibility, that did not necessarily mean he was evincing a conscientiousness of guilt related to the greater offense of dealing drugs, as suggested. Instead, it could simply evince an attempt to have the person who controlled the situation accept responsibility of his being in the presence of that contraband. In short, the direct evidence of appellant's actual involvement in the sale of drugs was not overwhelming.

Third, and as noted before, the State began the trial by telling the jury of the phone call and its substance. Then, of the three witnesses to testify on behalf of the State during the guilt/innocence phase of the trial, two were called to repeat and expand upon the substance of the call. We next add to that the video excerpt wherein the officer can be heard referring to the "report" about drugs being sold.

Most importantly, though, is the State's effort to have one of the policemen vouch for the anonymous caller's credibility. Such went far to resolve any question there may have been about appellant's participation in the actual sale of the contraband. Indeed, it is conceivable that a rational juror could question whether the words of an anonymous tipster or informant could be trusted. Having a police offer vouch for the credibility of a person he did not know could certainly be said to have addressed those doubts.

Fourth, as for the source and nature of the error, it was committed by the State during a trial occurring about three years after the Court of Criminal Appeals issued *Langham*. So, it cannot be said that precedent regulating the State's thought processes

12

in deciding whether to use the information was non-existent. And, given its concession that the evidence was hearsay, we are left with the impression that it proceeded despite knowing that the evidence was inadmissible on some ground.

Fifth, the harmless error rule serves a legitimate purpose. Yet, experience suggests that it has become more than a tool to assure that judgments remain intact despite the presence of insignificant error. Though few litigators would admit to it, we sense that a number have come to view the rule as an invitation to commit error while believing that the error will most likely be held harmless on appeal. Our interest in preventing such efforts is another reason why we hesitate to sanction a clear constitutional error simply because admissible evidence may establish appellant's guilt.

In short, authority from the highest criminal court in Texas indicated that the evidence at bar was inadmissible; despite that precedent, it was tendered by the State and admitted by the trial court. True, insignificant error should not necessarily require a new trial. But, the testimony in question was the only direct evidence illustrating that appellant sold the drugs. Of course the circumstantial evidence could have supported the jury's verdict, but the presence of another way to support the verdict is NOT an invitation to cast whatever is available before the jury irrespective of its obvious impermissible prejudice. And, if it was so insignificant here, we can only ask why the State engaged in rather extensive effort to have the jury hear it. Indeed, telling the fact finders about what the unknown caller said may not have been needed to win a conviction. Presenting it to them surely made the decision to convict easier, though. This was especially true when disclosure of that information is followed by an officer attesting to the credibility of a declarant about whom he actually knows nothing and appellant having no way of testing that credibility through cross-

examination. Appellant's constitutional right to confront that unknown tipster who uttered highly damning information was ignored here. That cannot be condoned through the simple invocation of the harmless error rule and its primary focus on the quantum of admissible evidence otherwise supporting the finding of guilt. *See Bjorgaard v. State*, 220 S.W.3d 555 (Tex. App.—Amarillo 2007, pet. dism'd, improvidently granted) (holding that because the evidence of guilt was not overwhelming, the court had little choice but to recognize the high likelihood that the prior conviction influenced one or more of the jurors.)

The totality of the circumstances at bar illustrate the presence of a substantial likelihood that admitting the words of the anonymous caller in contravention of appellant's Sixth Amendment right to confront that person was a contributing factor in the jury's deliberations and decision. We cannot say beyond reasonable doubt that it did not contribute to appellant's conviction. Therefore, the error was harmful. We reverse the judgment and remand the cause to the trial court.[6]

Brian Quinn
Chief Justice

Publish.

---

[6] Our disposition of this issue relieves us from having to address appellant's second issue pertaining to the use of a newspaper article about an unrelated criminal prosecution and found in appellant's wallet as relevant evidence during the punishment phase of the trial.