**Opinion issued February 20, 2014**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-12-00722-CR

_____

**ALEXANDER OLIVIERI, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 263rd District Court**
**Harris County, Texas**
**Trial Court Case No. 1301922**

---

## MEMORANDUM OPINION

A jury convicted appellant of murder, and sentenced him to sixty years' imprisonment. He appeals here, contending that (1) the jury should have been instructed that a State's witness was an accomplice as a matter of law, (2) the State did not present sufficient evidence to corroborate the accomplice's testimony, and

(3) the written consent appellant's father gave allowing police to search the residence and the vehicle appellant was driving the night of the murder was involuntary and invalid. We affirm.

## BACKGROUND

On April 3, 2011, the body of seventeen-year-old Bridgett Frisbie was discovered by a group of children in the woods behind a housing development in Katy, Texas. Neighbors reported hearing a gunshot early that morning (around 2:45 am), and reported to police that there had recently been a drive-by shooting in the area. The medical examiner testified that Bridgett had been shot in the back of the head at close range.

Early in the investigation, Investigator James Cassidy learned that Alan Perez had come forward with information about the case. On the evening of April 5, 2011, Perez told his mother that he gone with appellant to help scare, or "rough up" Bridgett, but that appellant had shot her without warning. Perez's family hired an attorney who negotiated an immunity agreement for Perez in exchange for his statement and testimony.

According to the testimony of several witnesses, including Perez, appellant was upset with Bridgett because she would not keep quiet about a drive-by shooting she participated in with appellant.

2

## A. Perez's testimony

Perez and appellant met in high school. They joined the National Guard together, but when appellant returned from basic training, he started attending a different school. According to Perez, Bridgett was one of the new friends appellant made at his new school.

Perez testified that Bridgett had been bragging about participating in a drive-by shooting with a friend, and that appellant had later told Perez that he was the shooter. Specifically, appellant told Perez that Bridgett "drove and he shot at her ex-boyfriend's house with his Yugo semiautomatic rifle."

Perez testified that, on the evening of April 2, 2011, appellant asked him for a favor. Appellant explained that he wanted to "rough up" Bridgett for telling friends about the drive-by, and he wanted Perez there as backup. Appellant instructed Perez to "get his gear" and bring a weapon. Perez brought a .380 pistol and wore his green military uniform, mask, and gloves. Appellant wore his 9mm Beretta pistol in a shoulder holster under his jacket.

According to Perez, they went to appellant's house after midnight. Appellant then called Bridgett and asked her to ride with him to pick up her boyfriend, Zach Richards, from the bus station. Bridgett declined, saying that she was busy. Appellant decided to go to Bridgett's house, and told Perez to hide under a blanket in the back of his Suburban. If appellant was successful in luring

3

Bridgett into the vehicle, appellant instructed Perez to get out and follow appellant and Bridgett at a distance when they reached their destination.

Bridgett was leaving on her four-wheeler to go meet friends when they got to her house, so they left. They set out again to find her a little later and found her pushing her four-wheeler because it had run out of gas. Appellant asked her to help him "dig up a cache of some random thing." She initially said "no," but eventually he talked her into going with him. She put her four-wheeler in the garage and climbed into the passenger seat of appellant's Suburban.

Perez was still hiding in the back of the vehicle under blankets. Appellant drove to the same neighborhood where he and Bridgett had done the drive-by shooting. Appellant and Bridgett got out of the vehicle, and Perez waited a minute and then got out and followed them. Perez saw appellant carrying a shovel and kind of leading Bridgett with a flashlight. Appellant pointed out a spot and asked Bridgett to start digging. As she bent over to dig, Perez saw appellant reach into his jacket, pull out his gun, put it to the back of Bridgett's neck, and fire.

Perez testified that he was shocked because he "thought [appellant] might threaten her, might poke her with the gun, but he had just shot her." Appellant ran towards Perez, and Perez "cursed at him for a bit." Appellant told Perez to shut up and run towards the car. Appellant returned to Bridgett's body to retrieve his shovel, flashlight, and Bridgett's cell phone. They drove to a "water tunnel" near

4

Perez's house where Perez, and then appellant, tried to destroy Bridgett's phone by banging it with the shovel. Appellant hid the phone in the water tunnel, and they returned to appellant's house. They took everything out of the Suburban and left it in appellant's room.

Appellant and Perez then went about 4:00 a.m. to pick up Richards at the bus station. Appellant offered to let Richards stay the night at his house, so they went back to appellant's house and all went to sleep. They did not say anything to Richards about the murder, but appellant told Perez that they should be each other's alibi, and that Perez should tell the police that he "had stayed at [appellant's] house, hung out, watched movies and then went to pick up" Richards.

A couple of days later, appellant's mom picked up both Perez and appellant and took them back to appellant's house. Appellant's mom had heard about Bridgett's murder and asked them numerous questions. When they got the opportunity to be alone, appellant told Perez that he was going to get rid of his Beretta and to stick to their alibi story.

Perez went home that night and told his parents what had happened. Perez turned over his gun and the clothes he wore the night of the murder to police. He also led police to Bridgett's destroyed phone.

Perez identified a picture of appellant's Beretta at trial. When a September 2010 YouTube video of appellant shooting at a gun range entitled "Me and My

5

Beretta 9 millimeter" was played for the jury, Perez testified that he had filmed the video for appellant on appellant's cell phone. Perez testified that the gun in the video was the same one that appellant used to shoot Bridgett.

**B.     Additional State's Evidence**

**1.     Zach Richards's testimony**

Bridgett's boyfriend, Richards, testified that in March of 2011 appellant stated that he was "going to deal with something," grabbed his AK-47, and left with Bridgett in Bridgett's car. Appellant told Richards later that he had shot at Bridgett's ex-boyfriend's house from Bridgett's car while Bridgett drove past. Appellant told Richards that he participated in the drive by "to do a favor for" Bridgett and just because "he could do it." Richards testified that Bridgett kept bragging about the shooting and that appellant angrily confronted her and told her to stop telling people.

On April 3, 2011, appellant had agreed to bring Bridgett to the Houston bus station to pick up Richards about 1:00 a.m. When appellant did not show up, Richards got a ride to a Denny's and finally reached appellant by phone about 2:30 or 3:00 a.m. Appellant told him that he was at home, but would come pick him up. Appellant finally arrived several hours late and Perez was with him. When Richards asked about Bridgett, appellant told him that he tried to get in contact with her and went by her house, but that he could not find her.

6

After getting some sleep at appellant's house, Richards walked to Bridgett's house. Her dad answered the door said that Bridgett had been out all night and that he did not know where she was. Richards tried to locate her through friends over the next couple of days until he heard the news that her body had been found.

Richards testified that he had been to the woods where Bridgett was shot with both appellant and Bridgett, so appellant was familiar with the area. Appellant had also taken Richards to the water tunnels where Bridgett's phone was found so they could shoot appellant's AK-47. Finally, Richards testified that it was common for appellant to have a gun with him.

## 2. Robert Frisbie

Robert Frisbie, Bridgett's father, testified that he last saw his daughter on April 2, 2011. On that day, he bought her a new rave outfit—blue-green faux-fur leggings, skirt and top. Appellant came by their house after they returned home from shopping, and Frisbie saw him having a tense conversation with Bridgett at the back door. Bridgett did not leave with appellant at that time.

Sometime after appellant left, another of Bridgett's friends, Kendall Suto, came over for dinner and stayed for the evening. Frisbie drove Bridgett and Kendall to a rave party, but it was closed and they eventually returned home a little after 10:00 p.m. Kendall's ride was not supposed to pick him up until midnight, so Bridgett and Kendall settled in to watch a movie. Bridgett was still wearing her

7

new rave outfit when Frisbie went to bed and set his alarm for midnight. He called downstairs when he woke up, but Bridgett said that Kendall's ride had not arrived yet. Frisbie told Bridgett to wake him when Kendall left so that he could lock up the house. When Frisbie awoke again about 3:00 am, he found the back door and the garage door open. He locked up so that Bridgett could not sneak back in without his knowledge. Then he realized that his cell phone was missing. He had taken away Bridgett's phone recently, so he assumed that she took his when she went out.

Frisbie called his cell phone repeatedly and looked online to track the phone's GPS location. After he was unable to reach her or ascertain the location of the phone, he gave up and decided to wait for her to return. He was unable to locate her the following day, despite calling several of her friends. Later the evening of April 3, he read online about a body being found nearby, and he called police and discovered it was Bridgett.

### 3. Physical Evidence

Appellant was arrested, and Samuel Olivieri, appellant's father, gave consent for the police to search their house and appellant's Suburban. Neither the AK-47 nor the Baretta were found. But the police did recover an owner's manual for a Beretta .9 millimeter.

8

In appellant's Suburban, police recovered a blanket, a shovel, and rifle and shotgun shell casings, as well as trace evidence samples—including fibers—from the passenger's seat and floor board. Ballistics testing revealed that the shell casing from the Suburban matched the shell casing recovered from the drive-by shooting at Larsen's house. Fibers lifted from the passenger seat of the car matched Bridgett's new rave faux fur outfit that she was wearing when her father last saw her on the night of April 2.

### 4. Officer J. Cassidy's Investigation

Officer Cassidy testified that Bridgett was still wearing the new faux fur outfit when her body was discovered, and that there was a .9 millimeter casing found near her body. He interviewed appellant early on in his investigation, before appellant was considered a suspect. The tape of that interview was played for the jury. In that statement, appellant said that he went by Bridgett's house about 5:00 p.m. on April 2. He said that he and Perez came back later that night to pick her up on the way to the bus station to get Richards, but that she was not waiting outside so he left without ever seeing her. Appellant also denied having any knowledge about handguns.

### C. Defendant's Evidence

Appellant's father, Samuel Olivieri testified that he had previously owned a 9 mm Beretta, but that he sold it in 2003. He testified that, when he went to bed

9

about 10:00 or 10:30 on April 2, appellant and Perez were there playing a video game. When he woke up the next morning, Richards was there too, asleep on an air mattress.

Appellant's mother, Angelica Olivieri, testified that Perez was over at their house the evening of April 2 playing video games with appellant. Around 10:30, Perez asked her if he could spend the night and she told him he could sleep on the couch. She testified that appellant then went to bed in his room about 11:30 p.m., and that his door squeaked so loudly that she would always hear if he opened or closed his bedroom door. At about 12:45 a.m., she got up to get a drink of water and noticed that Perez was gone from the couch. She got up again at 2:10 a.m. and looked in on her mom, her daughter, and appellant. She testified that appellant was asleep at that time. A little after 3:00 a.m., she heard appellant get up and he came and told her that he was going to pick up Richards. Perez was with him at that point. When she got up again, she found appellant, Perez, and Richards all asleep.

## D.    The Jury Charge and Verdict

Appellant requested that the jury be instructed that Perez was an accomplice as a matter of law, and that a conviction could not be had on his uncorroborated testimony. Instead, the court left it to the jury to resolve whether Perez was an accomplice, charging the jury as follows:

> [A] conviction cannot be had upon the testimony of an accomplice unless the accomplice's testimony is corroborated by

10

other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

Therefore, if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness, Alan Perez, was an accomplice, or you have a reasonable doubt whether he was or not, as that term is defined in the foregoing instructions, then you cannot convict the defendant upon the testimony of Alan Perez unless you further believe that there is other evidence in the case, outside of the testimony of Alan Perez tending to connect the defendant with the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

The jury found the defendant guilty of murder, and assessed punishment at sixty years' confinement.

## ISSUES ON APPEAL

Appellant brings three issues on appeal:

(1)     "The trial court committed reversible error in denying defense counsel's request to instruct the jury that Alan Perez was an accomplice witness as a matter of law."

(2)     "Insufficient evidence was presented to corroborate the testimony of Alan Perez, an accomplice witness."

(3)     "The consent to search provided to law enforcement by Samuel Olivieri was not given voluntarily and was therefore invalid."

## ACCOMPLICE TESTIMONY

In his first and second issues, appellant argues that Perez was an accomplice as a matter of law, and that there was not sufficient evidence to corroborate his

accomplice-witness testimony. The State responds that it was proper for the trial court to submit the fact issue of whether Perez was an accomplice to the jury and that, in any event, there was ample independent corroborating evidence that would render harmless the failure to so instruct.

**A. Applicable Law and Standard of Review**

An accomplice is a person who participates in an offense, before, during, or after the commission of a crime and acts with the required culpable mental state. *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). To participate in an offense, the witness must affirmatively act to promote the commission of the offense. *Paredes*, 129 S.W.3d at 536.

A witness is not an accomplice simply because he knew of the offense and did not disclose it. *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998); *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986). Evidence showing that a witness was present during the commission of the crime and participated in concealing the crime is not necessarily sufficient to raise the issue of accomplice-witness status. *Smith v. State*, 721 S.W.2d 844, 851 (Tex. Crim. App. 1986) ("Since there was no evidence adduced at trial to show anything other than Thompson's presence at the scene of the offense and his aid in carrying the body to appellant's truck, we hold that the trial court did not err in refusing to instruct the

jury that he was an accomplice witness."); *see also Gomez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987) ("If a State's witness has no complicity in the offense for which an accused is on trial, his or her testimony is not that of an accomplice witness whatever may have been his complicity with the accused in the commission of other offenses." (citations omitted)).

If the evidence creates a fact issue or is conflicting regarding whether a witness was an accomplice, the witness may be an accomplice as a matter of fact and the issue should be submitted to the jury. *See Blake*, 971 S.W.2d at 455; *see also Meeks v. State*, 135 S.W.3d 104, 110 (Tex. App.—Texarkana 2004, pet. ref'd). The trial court is under no duty to instruct the jury unless there exists no doubt or the evidence clearly shows that a witness is an accomplice as a matter of law. *Paredes*, 129 S.W.3d at 536. If the evidence presented by the parties is conflicting and it is not clear whether the witness is an accomplice, then the trial court must leave to the jury the question of whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term "accomplice." *Id*.

If, however, the evidence clearly shows that a witness is an accomplice, then the witness is an accomplice as a matter of law, and the trial court has the duty to instruct the jury of this fact and of the necessity of corroborative evidence. *See DeBlanc v. State*, 799 S.W.2d 701, 708 (Tex. Crim. App. 1990). A prosecution

13

witness who is indicted for the same offense for which the defendant is charged or a lesser included offense arising out of the same criminal episode is an accomplice as a matter of law. *Herron*, 86 S.W.3d at 631; *cf. Paredes*, 129 S.W.3d at 536 (accomplice as a matter of law is one who is susceptible to prosecution for offense for which defendant is charged or lesser-included offense). If a prosecution witness is an accomplice as a matter of law, the trial court errs if it fails to instruct the jury accordingly. *Herron*, 86 S.W.3d at 631. The critical question for the court of appeals is not whether the alleged accomplice has been charged, but whether there is sufficient evidence in the record to support a charge. *Blake*, 971 S.W.2d at 455.

When error regarding the trial court's failure to submit an accomplice witness instruction is properly preserved, reversal is required if "some harm" is shown. *Herron*, 86 S.W.3d at 632. Nonaccomplice testimony can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve. *Id*. A harmless error analysis for the omission of an accomplice witness instruction should be flexible, taking into account the existence and strength of any nonaccomplice evidence. *Id*. An appellate court examines the strength of nonaccomplice witness testimony by: (1) its reliability or believability; and (2) the strength of its tendency to connect the defendant to the crime. *Id*. The reliability inquiry may be satisfied if: (1) there is

14

nonaccomplice witness evidence; and (2) there is no rational or articulable basis for disregarding the nonaccomplice evidence or finding that it fails to connect the defendant to the offense. *Id*. at 633.

**E.     Analysis**

We need not reach whether it was error to refuse appellant's requested instruction that Perez was an accomplice as a matter of law because we conclude that the nonaccomplice evidence is sufficient to render any error harmless. Applying the approach mandated by the Court of Criminal Appeals, we must evaluate the existence and strength of the nonaccomplice witness testimony. There is no bright-line rule, and nonaccomplice evidence is not viewed piecemeal. Instead, we look at the combined force of the nonaccomplice evidence, including motive, opportunity, demeanor and actions before and after the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). "[A]s the corroborating evidence gains in strength to the point that it becomes implausible that a jury would fail to find that it tends to connect the accused to the commission of the charged offense, then a reviewing court may safely conclude that the only resultant harm is purely theoretical and that there is no occasion to reverse the conviction, even in the face of an objection, since the jury would almost certainly have found that the accomplice witness's testimony was corroborated had it been properly

instructed that it must do so in order to convict." *Casanova v. State*, 383 S.W.3d 530, 539–40 (Tex. Crim. App. 2012).

Here, a review of the nonaccomplice evidence demonstrates that any error in refusing to instruct the jury that Perez was an accomplice was harmless. *See id*. Evidence of motive or opportunity is insufficient alone to corroborate accomplice testimony, but may be considered in connection with other evidence tending to connect the accused with the crime. *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988). Here, the jury heard Richards's testimony about appellant's motive, i.e., appellant's desire to keep Bridgett quiet about the drive-by shooting. As for opportunity, Richards testified to having been, with appellant, both to the spot in the woods where Bridgett was shot and to the water tunnel where Bridgett's phone was found to shoot appellant's AK-47. The jury heard evidence that Bridgett and appellant were friends, and that appellant had an excuse to get Bridgett into his vehicle in the early morning hours of April 3. Finally, Richards testified that appellant was several hours late in picking him up on the morning of April 3. The fact that neither the .9 mm or AK-47 were found at appellant's house, taken in conjunction with Richard's testimony that appellant often carried his AK-47, supports the inference that appellant recently got rid of his guns.

Most importantly, Bridgett's father, Frisbie, confirmed that the outfit Bridgett was wearing when she was killed had been purchased on April 2. He

testified that she was wearing that outfit and at home until midnight on that day watching a movie with a friend. Analysis of fibers from appellant's Suburban matched Bridgett's new outfit, leading to the logical inference that she was in appellant's vehicle after midnight that night (despite appellant's denial that he had seen her that evening). Neighbors near where she was murdered heard a single gunshot about 2:45 a.m. Richards testified that appellant was supposed to pick him up at 1:00 a.m. on the morning of April 3, but that appellant and Perez were several hours late picking him up. Bridgett's murder occurred during that delay.

Not only does the combined force of this nonaccomplice testimony strongly implicate appellant and corroborate Perez's testimony by linking appellant to the crime, there is no rational and articulable basis for disregarding any of this nonaccomplice evidence. *Herron*, 86 S.W.3d at 632. Because we conclude there is sufficient evidence corroborating Perez's testimony, any error in the trial court's submitting the issue of whether Perez was an accomplice as a fact question instead of as a matter of law was harmless.

We overrule appellant's first and second points of errors.

## CONSENT TO SEARCH

In conjunction with the warrant for appellant's arrest, police obtained a search warrant for appellant's family's residence. When police arrived to execute the warrants, they received written consent from appellant's father, Samuel

Olivieri, to search both the house and the family's Suburban.[1]  The consent form, entitled "Voluntary Consent for Search and Seizure," states that the constitutional right to refuse consent had been explained, and that the consent was given freely and voluntarily.  The form was signed and dated by Samuel and contained witness signatures of Deputy J. Cassidy and Deputy Fisher.

Before trial, appellant moved to suppress evidence from the search of the Suburban, arguing that the consent was not voluntary.  Deputy Cassidy testified that he provided Olivieri the form, gave him an opportunity to wake up and get his bearings, allowed him to read the form in its entirety, and asked him if he understood the form.  Olivieri, on the other hand, testified that officers told him that he needed to sign the form because they had a search warrant for the house. He stated that he did not read the form at the time, and no one told him that he did not have to sign it.

The trial court found the consent to be voluntary and denied appellant's motion to suppress the evidence from the Suburban.

### A.    Applicable law and Standard of Review

We review a ruling on a motion to suppress for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008).  We give almost total deference to a trial court's determination of historical facts, especially if those

---

[1]    The title to the Suburban is in Samuel's name, but appellant was allowed to drive it at times.

determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Because issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011).

A voluntary consensual search is an exception to the probable cause and warrant requirements of the Fourth Amendment of the United States Constitution and article I, section 9 of the Texas Constitution. *Guevara v. State*, 97 S.W.3d 579, 582 (Tex. Crim. App. 2003); *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000). "The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily." *Gutierrez v. State*, 221 S.W.3d 680, 686 (Tex. Crim. App. 2007). "[C]ourts review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Meekins*, 340 S.W.3d at 459 (citing *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 2783 (1985)). "The ultimate question is whether the

19

person's 'will ha[s] been overborne and his capacity for self-determination critically impaired,' such that his consent to search must have been involuntary." *Id*. (quoting *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828 (1976)).

In this analysis of voluntariness courts may consider numerous factors, including: physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances. *Id*. at 460 (citing *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998)). We may also consider appellant's age, education, and intelligence, the length of detention, any constitutional advice given to the defendant, and the repetitiveness of the questioning. *See Reasor*, 12 S.W.3d at 818. Other relevant factors are whether appellant was in custody, or had been arrested at gunpoint; and whether appellant was warned that he had the option to refuse to consent. *Flores v. State*, 172 S.W.3d 742, 749 (Tex. App.—Houston [14th Dist.] 2005, no pet.). In examining the totality of the circumstances surrounding the consent to search, the trial court should consider the circumstances before the search, reaction of the accused to pressure, and any other factor deemed relevant. *Reasor*, 12 S.W.3d at 818.

20

## B. Analysis

Appellant argues the following facts, taken in their totality, demonstrate that Samuel Olivieri's consent was involuntary: (1) "Samuel was held at gunpoint and pushed down with a shield in the midst of numerous officers," (2) "Samuel was not verbally advised that he had a right to refuse consent," (3) "a reasonable person's mental faculties would be affected by the time and manner of the warrant's execution."

At the motion to suppress hearing, Olivieri testified that officers arrived at his house around 2:30 a.m. When he came out of his bedroom, an officer with a shield pushed him and told him not to move. Either the same officer or a different one pointed a gun at Olivieri and pushed him against a wall. Police then grabbed appellant, threw him on the ground, put handcuffs on him and led him away. Several officers then started moving around the house. Olivieri was then approached by two officers in civilian clothes to discuss searching the home and Suburban. According to Olivieri, the officers simply told him that he needed to sign the consent form. At the suppression hearing, he testified that he did not recall being told anything specific about the form, but his understanding was that he needed to sign the form because the police had obtained a search warrant. He claims he did not read the form—he just signed it.

Officer Cassidy's testimony differed from Olivieri's. Cassidy testified to first meeting with Olivieri after appellant was arrested. Cassidy stated that he first allowed Olivieri to read both the consent form (dealing with the residence and the Suburban) and the search warrant (applicable to the residence) before asking for his consent. Olivieri did not give any indication that he did not understand what he was signing. While Cassidy acknowledged during his testimony that the interaction was early in the morning and that Olivieri had been woken by police, he testified that Olivieri was given an opportunity to wake up, and that he was allowed to read the consent form in its entirety. Cassidy asked him if understood the form, and Olivieri did not give any indication that he did not understand it. Cassidy agreed with Olivieri's testimony that Cassidy never verbally informed Olivieri that he had the right to not sign the form, but he disputed Olivieri's contention that officers told Olivieri that he was required to give consent because of the warrant police already had to search the house.

We must view the totality of these circumstances in a light most favorable to the trial court's finding of voluntary consent. *Meekins*, 340 S.W.3d at 460. Written consent to search, such as that provided by Olivieri here, indicates that consent is definite and unequivocal, because a person will generally "consider a decision with more care and deliberation if [he or she] signs something rather than making an off-handed verbal consent." *Lackey v. State*, 638 S.W.2d 439, 452 (Tex.

22

Crim. App. 1982). Much of appellant's argument for looking past Olivieri's written consent to deem his consent involuntary is not supported by the actual testimony from the suppression hearing or viewed in the appropriate light. Appellant insists that consent must have been "given involuntarily in the face of an overwhelming display of authority as he was violently awakened at 2:00 a.m. and immediately confronted with unfamiliar paperwork in an extreme and unexpected circumstance." According to the evidence at the suppression hearing, police did unexpectedly barge into Olivieri's house between 2:00 and 2:30 a.m., and he was restrained until appellant was arrested. Olivieri testified, though, that he was not approached by Cassidy and Fisher until after appellant was arrested and taken away. This is consistent with Cassidy's testimony that the voluntary consent form was "not immediately jostled and shoved . . . in front of him." Rather, Olivieri "was given a chance to wake up," and then Cassidy "explained the circumstance of the search warrant to him before providing him the form. He was allowed to read it in its entirety," and Cassidy inquired about his understanding of the form.

While a show of force can be indicative of coercion and render consent involuntary, the show of force here—which preceded the consent and involved efforts to take appellant (rather than Olivieri) into custody—does not rise to the level of the force found coercive in *Lowery*, the case cited by appellant. *See Lowery v. State*, 499 S.W.2d 160, 167 (Tex. Crim. App. 1973) (verbal consent by

23

17-year-old non-occupant held involuntary; approximately twenty officers entered apartment to arrest occupant, several officers had guns drawn; there was no evidence about the circumstance of consent, how consent was requested or obtained, or about any conversation that led to the 17-year-old telling the officer that she had "no objection").

Appellant contends that Olivieri's "lack of knowledge of any right to refuse to sign the form" weighs in in favor "of a lack of voluntary consent." The evidence, however, was conflicting on this point. While Olivieri testified that he was not aware that he could refuse consent, he does not claim he was rushed to sign the consent form, the consent form itself informed him that he could refuse, and Cassidy testified that he asked if Olivieri understood the form. On this record, the trial court could have resolved this conflicting testimony in favor of a finding of voluntariness. *Gutierrez*, 221 S.W.3d at 687 (conflicting evidence should be resolved in favor of trial court's ruling). Appellant has not demonstrated an abuse of discretion in the trial court's denying his motion to suppress the evidence seized in the search of the Suburban.

We overrule appellant's third point of error.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Massengale and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).