**Opinion issued June 29, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00425-CR

_____

**ANDRE SMALL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1575633**

---

## MEMORANDUM OPINION

Appellant Andre Small was charged with Felon in Possession of a Firearm.

The charged offense was enhanced by allegations that Appellant previously had

been convicted of the felony offense of possession of a controlled substance and

the felony offense of theft. Prior to trial, the trial court heard and denied

Appellant's motion to suppress evidence seized from his car at the time of his arrest. A jury convicted Appellant of the unlawful possession charge, and he pleaded "true" to the enhancement allegations.[1] The jury assessed Appellant's punishment at twenty-five years' confinement in the Correctional Institutions Division of the Texas Department of Criminal Justice. Appellant filed a timely notice of appeal.

In his first issue, Appellant argues the trial court erred in admitting the recording of a 911 call over his Confrontation Clause and hearsay objections. In his second issue, Appellant argues the trial court erred in denying his motion to suppress evidence recovered during the search of his car because the officers lacked reasonable suspicion to justify his detention and arrest.

We affirm.

## Background

On December 31, 2017, the Houston Police Department ("HPD") dispatch received a 911 call from a woman who believed she was witnessing a kidnapping. During the call, the woman, who identified herself as "Creshell," told the dispatcher she saw a man who appeared to be stuffing someone into his car's trunk and that she saw "legs kicking." After she was transferred to a police sergeant, Creshell told him it "look[ed] like someone just put somebody in the trunk of their

---

[1] Small previously was convicted of the felony offenses of arson, possession of a controlled substance, and theft.

2

car . . . . Their legs were kicking." She told him the car was white and similar to an old-style police car with paper tags. She stated that because of a left rear flat tire, the man was driving on its rim. Creshell followed the man, who was driving erratically. Once the car stopped, Creshell told the sergeant where to find the car. She remained at the scene until law enforcement arrived. The suspect, later identified as Appellant Andre Small ("Small"), was detained and ultimately arrested by police at the scene. The police found a large opaque bag in the trunk of the car, but no human body. Officers recovered a loaded .9mm handgun in plain view on the front passenger seat of the car. After taking Small into custody, the police ran a background check on him and learned he was a convicted felon.

Small was charged with felon in possession of a firearm.[2] He pleaded not guilty. Prior to trial, the trial court conducted a hearing and denied Small's Motion to Suppress evidence of the gun that was recovered from his car.[3]

---

[2] Small also was charged with assault against a public servant and retaliation. Those charges were dismissed.

[3] The Motion to Suppress sought to exclude evidence of Small's arrest, any evidence related to the arrest, testimony by law enforcement about Small's action while in detention or under arrest, all written and oral statements Small made to any law enforcement officers in connection with this case and testimony by law enforcement regarding such statements. The only matter on appeal relates to the denial of the Motion to Suppress with respect to introduction of evidence regarding the gun recovered from Small's car.

## A.   The Motion to Suppress Hearing

Small's Motion to Suppress requested that the trial court exclude any statements obtained from Small, "any tangible evidence seized in connection with this case, including but not limited to Firearm, namely Smith & Wesson 9mm Luger," and all evidence that "relates to the arrest and, and any testimony by the Houston Police Department or other law enforcement officers or others concerning any action of [Small] while in detention or under arrest in connection with this case."

Three HPD officers testified during the hearing on the Motion to Suppress. Excerpts of two of the officers' body-worn camera videos and Creshell's 911 call were played during the hearing.

### 1.   Officer Preston

HPD Officer Wesley Preston ("Officer Preston") testified that on December 31, 2017, he was dispatched to a "suspicious vehicle, citizen following" call. The 911 caller reported "observing a male stuff a body into the trunk of a vehicle." Officer Preston knew nothing about the caller or her reliability. When he and his partner arrived at the scene and located the car, one patrol unit was already at the scene. When Officer Preston arrived, Small was not "doing anything inappropriate."

Small was told to exit his car, keep his hands visible, face away from the officer, and stop moving. Small initially followed the officer's command. He got out of his car and kept his hands visible. But then he began to walk toward the officers. Officer Preston testified that Small was not aggressive and the officers had not seen him do anything wrong as of yet. However, Small disregarded the officer's command to stop walking and face away from the officers. Small turned and began to walk away from the officers toward his car. When Small dropped his hands and was ordered to put his hands back up, he did. Small seemed confused about the commands.

Small was ordered not to return to his car but he did so anyway. Officer Jose Gonzalez ("Officer Gonzalez") then grabbed Small to prevent him from getting in his car. At that point, the officers did not have personal knowledge that a crime had been committed. Officer Preston testified that Officer Gonzalez did not grab Small in a violent manner but a struggle ensued between the officer and Small, who allegedly struck Officer Gonzalez. By now, four officers were at the scene. All participated in restraining Small until Officer Preston told them to let him go, because it was easier for one person to subdue a suspect.

Small was handcuffed and arrested for resisting a lawful detention. Officer Preston testified that Small was detained for a reported criminal activity, but he acknowledged that he had not seen Small do anything illegal and did not know

whether the 911 caller had been truthful. Officer Preston said none of the officers struck Small as he was being handcuffed and arrested.

After Small was detained, the officers recovered a loaded firearm in plain view on the front passenger seat of the car and drug paraphernalia. Officer Preston was not sure who searched Small's car first. He did not see Small put the gun in the front passenger seat and did not know who put the gun there. Officer Preston conceded the officers did not find a human body in the trunk of the car, so the 911 caller was incorrect, and that Small did nothing wrong in his presence.[4] He testified Small did not make any gestures such as trying to grab a weapon from his car; rather, Small got out of the car with his hands up.

Officer Preston testified that when police believe someone is being forcibly restrained or that there is a dead body in a car, the officers follow the procedure for a "high risk or felony traffic stop." During a felony traffic stop, the officers exit their vehicles with weapons drawn and pointed at the occupant of the car at issue. Officers give the car occupant verbal instructions to prevent him from escaping or accessing a weapon from inside the car. Officer Preston testified that Small would have been detained regardless of whether he had complied with Officer Preston's demands, because the 911 caller reported a potentially "very violent and egregious felony." He testified that any person reported to be involved in a kidnapping

---

[4] Officer Preston's body cam shows that police removed what appears to be a duffel bag from the trunk of Small's car.

through a call, such as the call made by Creshell, would have been treated the same as Small. The person would have been stopped by police with guns drawn.

### 2. Officer Gonzalez

Officer Gonzalez testified that he and his partner, Officer Joseph Adovasio ("Officer Adovasio"), were the first to arrive at the scene. He was called to the scene in response to a 911 call about "somebody stuffing a body inside the back of a trunk." Small was the only occupant of the car when the police arrived.

During the detention, Officer Gonzalez and Officer Preston were on opposite sides of Small's car and had different vantage points. Officer Gonzalez approached Small because Small was not obeying the officers' commands. Officer Gonzalez told Small to raise his hands, but Small did not comply. Officer Gonzalez grabbed Small, and when he attempted to pull away, Officer Gonzalez pushed Small against the car to control his body, at which time Small struck the officer. Small was put in handcuffs and arrested after he struck Officer Gonzalez. Officer Gonzalez testified he did not see Small commit any crime prior to the altercation. But once Small was on the ground, he was aggressive.

Officer Gonzalez testified he did not know who put the gun on the front passenger seat of Small's car. To Officer Gonzalez's knowledge, no officer put the

handgun on the front passenger seat. Officer Gonzalez testified Small told the police that the bullet in the loaded gun was for them.[5]

Officer Gonzalez conceded that no human body or blood was found in the car, so the 911 caller was wrong. He testified that said any person accused of having a body in his car would have been treated the same way Small was treated during the detention and arrest.

### 3.    Officer Adovasio

Officer Adovasio testified that the contents of the 911 call were relayed to him and Officer Gonzalez through dispatch. Officer Adovasio testified he was the first person to come into contact with Small's car. He approached the car because there were reports of a human body in the trunk. He wanted to make sure he did not see "blood or anything like that."

Officer Adovasio testified that when Small exited the car, he was aggressive. The officers were already on high alert due to the nature of the 911 call. Small did not comply with the officers' orders after emerging from the car. Officer Gonzalez approached Small to keep him from returning to his car. When Officer Gonzalez approached Small to detain him, Small elbowed the officer in the face. There was a struggle, but Officer Adovasio does not recall Officer Gonzalez being aggressive with Small. He recalls that Small was the aggressor, and as a result, the officers

---

[5]    *See infra*, note 7.

"took him to the ground." Officer Adovasio could not recall whether he punched Small in the body, although he acknowledged it was possible, as Small was on the ground and they were trying to pull his arms out from underneath his waist. Officer Adovasio testified that Small was not beaten and punched while he was in handcuffs. Officer Adovasio subsequently reviewed his report, in which he stated that he "had to repeatedly hit [Small] in his stomach and in his ribs."

Small had to be detained before they could investigate whether a human body was in the trunk of his car. Although the officers did not find a human body in the car, Officer Adovasio testified that Small assaulting a peace officer was sufficient reason to arrest Small. When Officer Adovasio approached Small's car, he saw a gun on the front passenger seat with the barrel pointing toward the front of the car. No one approached the passenger side of the car prior to Officer Adovasio. When Officer Adovasio picked up the gun, he realized it was loaded. Officer Adovasio did not see Small put the gun on the seat and does not know how it got there.

The State argued that while there may be some disagreement as to the propriety of the "manner and means" by which Small was detained, the crux of the inquiry was whether the officers had "reasonable suspicion to believe that [Small] had been engaged in criminal activity" and whether that was sufficient basis "for them to conduct an investigation." The State argued officers made a felony traffic

stop based on the 911 call about a potential kidnapping. At the time, there was no reason for them to believe that the stop or the basis of the stop or the information was unreliable. The officers confirmed the identifying information about the car. The State argued that when officers respond to a scene, they need to be able to rely on information given by third parties, and that these officers had "reasonable suspicion to detain [Small] and search his vehicle for the crimes or evidence of the crime."

Small argued that while the officers had a right to detain Small, they did not have the right to arrest him before a weapon was found. Small claimed that the officers would do whatever was necessary to justify their stop. He argued that because he was illegally detained, evidence of the gun, the video footage, and "anything that is relating to this stop" should be excluded pursuant to the Fourth Amendment.

The trial court denied Small's Motion to Suppress.

## B.     The trial

Two witnesses—Officers Preston and Adovasio—testified during the guilt-innocence phase of trial.

### 1.     Officer Preston

Officer Preston testified that on December 31, 2017, he was dispatched to investigate an allegation of kidnapping. After the 911 call was received, Officers

Adovasio and Gonzalez arrived at the scene. Officer Preston was in the second unit that arrived.

Officer Preston testified that although he had never met the 911 caller, Creshell, before, he believed she was credible because in his experience:

> When it comes to reportees following incidents that they observed, if they're following for a very long amount of time, if they feel like they may personally be in danger by following this person, it kind of speaks to their frame of mind as to why they're following. They're very much vested if they continue to follow a person that they believe has committed an offense.

Officer Preston continued:

> In my experience, the fact that she was willing to continue to follow [the car] until law enforcement made it on the scene I thought spoke to her credibility at the time.

Creshell remained at the scene until the suspect was in custody.

Officer Preston testified that Small was the car's sole occupant. Small exited the car shortly after the police arrived and followed some of the officers' commands. When they first arrived at the scene, the officers did not tell Small why he was being detained, but all four officers had their guns drawn and pointed at him. Officer Preston acknowledged that when Officer Gonzalez first grabbed Small, Small had not done anything wrong. Officer Preston picked up Small and dropped him on his chest, but he testified he did not observe any other officers hitting Small or beating him. He saw officers attempting to put Small's hands behind his back and a taser being used by Officer Andrew Graff ("Officer Graff").

11

Small was tasered because the officers were having a hard time controlling Small to handcuff him.

After Small was subdued, some of the officers began to search his car. Officer Preston testified about the .9 mm Smith & Wesson handgun Officer Adovasio found in Small's car. Officer Preston testified that he did not see Small with the gun or know how the gun got into the car but he knew it belonged to Small because Small said it was his gun. After the officers found the gun, the officers put Small in the back of Officer Gonzalez's police vehicle.

Officer Preston was wearing a body camera that showed the interaction between Small and the officers. The jury saw the footage from the camera. After detaining Small, the officers ran a "person check" on Small and learned he was a convicted felon. Officer Preston testified that anyone would have been detained in the same manner with guns drawn based on Creshell's 911 call.

### 2. Officer Adovasio

Officer Adovasio testified that when he approached Small's car, he saw the 911 caller parked on the side of the road, where she remained until the officers were done. He said he had never interacted with the 911 caller before. Officer Adovasio testified that all 911 calls are taken seriously.

Officer Adovasio and his partner, Officer Gonzalez, were the first to arrive at the scene. Officer Adovasio was wearing a body-worn camera, the footage of

12

which was shown to the jury. Whereas a regular traffic stop would be made in response to something like a broken taillight or a minor traffic violation, Officer Adovasio testified this was a felony stop with a "possible kidnapping." The officers did not recover a human body from the suspect's car.

Officer Adovasio testified that when he arrived at the scene, he did not see Small do anything wrong.[6] Small was just sitting in his car and emerged from the car when the police arrived and told him to get out of the car. Small complied with the initial command to put his hands up. But when Small began walking back toward his car, the police became concerned because they did not know what was in the car. When Officer Gonzalez attempted to detain Small, Small struck Officer Gonzalez in the face, causing him to bleed. The other officers responded by helping Officer Gonzalez "get the defendant detained." Officer Adovasio testified Officer Gonzalez was not aggressive until he was struck in the face.

Small was on the ground telling the officers to handcuff him, but he was actively fighting them. So Officer Adovasio delivered "multiple strikes to his ribs and back just to get him to comply because he was still actively fighting us despite what he was saying." Small was also tased.

Officer Graff checked the trunk of the car for a human body. Officer Adovasio checked the interior of the car to make sure there was no sign of a

---

[6] This conflicts with his testimony during the suppression hearing that Small was "aggressive" when he exited his car.

kidnapping in the car. The passenger-side window was open and when he leaned into the car, Officer Adovasio saw "a firearm sitting in plain view on the [front] passenger seat." Officer Adovasio said, "We have a gun." Small responded, "Yeah, I got a gun." Officer Adovasio cleared the gun to make sure there was no round inside the chamber. While doing that, a round came out of the chamber, meaning the gun was loaded. When the police mentioned the loaded gun, Small said, "That one's for y'all."[7] Officer Adovasio did not see Small put the gun on the seat.

Officer Adovasio testified he believed Creshell, the 911 caller, was credible even though he had never talked to her before and he did not have any data as to whether she was truthful. Although he had believed that a crime had occurred when the officers stopped Small, Officer Adovasio acknowledged that no crime had occurred and Small did not commit a crime in the officers' presence. Officer Adovasio testified that any suspect involved in a felony traffic stop would have been treated the same as Small.

The defense did not present any witnesses during the guilt-innocence phase of trial and no witnesses testified during the punishment phase. The jury convicted Small of the unlawful possession charge and he pleaded "true" to the enhancement

---

[7]   The video from the officer's body-worn camera reflects that Small said about the loaded gun, "A loaded gun? . . . You sure right. For you, motherfucker. . . . If I got a loaded motherfucking gun, that's for you motherfuckers."

14

allegations. The jury assessed Small's punishment at twenty-five years' confinement in the Correctional Institutions Division of the Texas Department of Criminal Justice. This appeal ensued.

In two issues, Small argues the trial court erred in (1) admitting the recording of the 911 call over his Confrontation Clause and hearsay objections, and (2) denying his motion to suppress evidence recovered during the search of his car because the officers lacked reasonable suspicion to justify his detention and arrest.

**Discussion**

**A.     Standard of Review and Applicable Law**

**1.     Motion to Exclude Evidence**

In most circumstances, we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Henley*, 493 S.W.3d at 83; *see also Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (stating trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree"). However, we review de novo the trial court's ruling that the admission of the 911 call did not violate Small's rights under the Confrontation Clause. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App.

2006); *Cook v. State*, 199 S.W.3d 495, 497 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The Confrontation Clause provides that the accused has the right to be confronted with the witnesses against him in a criminal trial. U.S. CONST. amend. VI. The Confrontation Clause bars out-of-court testimonial statements unless the witness is unavailable to testify at trial and the defendant had the opportunity to cross-examine him. *Ramjattansingh v. State*, 587 S.W.3d 141, 159 (Tex. App.— Houston [1st Dist.] 2019, no pet.) (citing *Martinez v. State*, 327 S.W.3d 727, 738 (Tex. Crim. App. 2010) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). Once a defendant asserts a Confrontation Clause objection, the State bears the burden to demonstrate (1) that the evidence does not contain testimonial hearsay statements, or (2) it if does, that the testimonial hearsay statements are admissible nonetheless. *Gutierrez v. State*, 516 S.W.3d 593, 597 (Tex. App.—Houston [1st Dist.] 2017, pet. ref 'd) (citing *De La Paz v. State*, 273 S.W.3d 671, 681-82 (Tex. Crim. App. 2008)).

There is no explicit definition of "testimonial." *See Wall*, 184 S.W.3d at 734. Generally, a statement is testimonial "if a reasonable person would have understood that law enforcement officers were conducting a criminal investigation and collecting evidence for the purpose of prosecution." *Ramjattansingh*, 587 S.W.3d at 159. Conversely, a statement is nontestimonial when "the primary

purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Statements made during a 911 call whose primary purpose is "to enable police assistance for an ongoing emergency" are not considered testimonial. *Ramjattansingh*, 587 S.W.3d at 159 (citing *Cook*, 199 S.W.3d at 497–98); *see also Davis*, 547 U.S. at 822. The Confrontation Clause does not require the exclusion of non-testimonial statements. *Ramjattansingh*, 587 S.W.3d at 159; *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Crim. App. 2011).

Whether a given statement is testimonial is a question of law. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010). In our review, we defer to the trial court's "resolution of credibility issues and historical fact." *Id.* We consider whether "the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* (quoting *De La Paz*, 273 S.W.3d at 680).[8]

---

[8] Small asserts the trial court erred in admitting the 911 call over his "hearsay and Confrontation objection." To the extent Small attempts to assert separate hearsay and Confrontation Clause objections, we note that hearsay and Confrontation Clause arguments are distinct issues, governed by different standards of review. Hearsay challenges to a trial court's admission of evidence are reviewed for abuse of discretion, while, as noted, whether a statement is testimonial or non-testimonial under the Confrontation Clause is reviewed de novo. *Infante v. State*, 404 S.W.3d 656, 662 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006)). As briefed, Small's

The admission of a testimonial statement in violation of the Confrontation Clause is subject to a constitutional harm analysis under Rule of Appellate Procedure 44.2(a). *See* TEX. R. APP. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."); *see also Wall*, 184 S.W.3d at 746 (noting that if there is reasonable likelihood that error materially affected jury's deliberations, then error is not harmless beyond reasonable doubt); *Langham*, 305 S.W.3d at 582 (noting that constitutional harm analysis applies to violations of Confrontation Clause). In such a harm analysis, "the question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict—whether, in other words, the error adversely affected 'the integrity of the process leading to the conviction.'" *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) (citation omitted).

### 2. Motion to Suppress

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019);

first issue is solely a Confrontation Clause issue that turns on whether the 911 call was testimonial or non-testimonial.

*State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Under the bifurcated standard, we give the trial court "almost complete deference" in its determination of historical facts, especially if based on an assessment of demeanor and credibility, and the same deference is afforded the trial court for its rulings on application of law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of demeanor and credibility. *Id.* (citing *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). We review questions of law de novo. *Id.* For mixed questions of law and fact, our review is also de novo. *Id.*

"We view the record in the light most favorable to the trial court's ruling and uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case." *Ruiz*, 577 S.W.3d at 545; *Balderas v. State*, 629 S.W.3d 610, 613–14 (Tex. App.—Houston [1st Dist.] 2021, no pet.). When a trial court denies a motion to suppress and does not enter findings of fact, "the evidence is viewed 'in the light most favorable to the trial court's ruling' and we 'assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record.'" *Herrera v. State*, 241 S.W.3d 520, 527 (Tex. Crim. App. 2007) (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

A police officer may temporarily detain a person for investigative purposes "if the officer reasonably suspects that the detained person is connected with a crime." *Pate v. State*, 518 S.W.3d 911, 914 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *Wade v. State*, 422 S.W.3d 661, 669 (Tex. Crim. App. 2013)). Reasonable suspicion exists "when a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Pate*, 518 S.W.3d at 914 (citing *Navarette v. California*, 572 U.S. 393, 396 (2014)). Courts determine if reasonable suspicion exists by viewing the totality of the circumstances objectively. *Id.*

Whether reasonable suspicion exists "is dependent upon both the content of information possessed by police and its degree of reliability." *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "The detaining officer need not personally be aware of every fact that supports a reasonable suspicion to detain because the content of the information possessed by the police includes the totality of the information known collectively to the cooperating peace officers, including dispatchers." *Pate*, 518 S.W.3d at 914 (citing *Derichsweiler v. State*, 348 S.W.3d 906, 915 (Tex. Crim. App. 2011) (explaining that dispatcher is regarded as "cooperating officer" for purposes of determining reasonable suspicion)).

20

A stop may be justified "if the facts underlying the stop are observed by a civilian informant." *Pate*, 518 S.W.3d at 914 (citing *Navarette*, 572 U.S at 397–98). Courts have identified several indicia of reliability regarding tips from a citizen informant. For example, courts consider an informant who is not connected with the police "inherently trustworthy when advising the police of suspected criminal activity." *Id.*; *Taflinger v. State*, 414 S.W.3d 881, 885 (Tex. App.—Houston [1st Dist.] 2013, no pet.). In addition, an informant may be treated as more reliable if she provides a firsthand account and a detailed description of wrongdoing. *Pate*, 518 S.W.3d at 914; *Hawes v. State*, 125 S.W.3d 535, 539 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also Navarette*, 572 U.S. at 399 (observing that contemporaneous eyewitness reports of suspected criminal activity have "long been treated as especially reliable"); *Pipkin v. State*, 114 S.W.3d 649, 655 (Tex. App.—Fort Worth 2003, no pet.) (holding traffic stop was justified because caller was disinterested private citizen who gave detailed description of suspect's car and location and made himself accountable for intervention by providing contact information to dispatcher).

If we find the trial court erred in denying a motion to suppress, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. *Gibson v. State*, 253 S.W.3d 709, 716–17 (Tex. App.—Amarillo 2007, pet. ref'd). The question is whether the trial court's denial of the motion to

21

suppress and the admission of the evidence were harmless beyond a reasonable doubt. *See id.* (citing *Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997)). When we apply the "harmless error" test, we consider "whether there is a 'reasonable possibility' that the error might have contributed to the conviction." *Id.* (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

## B. Analysis

### 1. Admitting the 911 Call

Small argues in his first issue that the trial court erred in admitting the recording of the 911 call over his hearsay and Confrontation Clause objections because the caller was calm, any potential emergency was not hers, and the call was made in anticipation of investigation and litigation. During trial, the State offered the 911 call and Small asserted hearsay and Confrontation Clause objections:

Pink:[9]   [T]hat 911 tape is not admissible because I didn't have a chance to cross-examine and confront the lady that – who's actually witnessed this thing and actually show that her perception of what actually happened did not correspond.

. . .

Koutani:[10]   So, first and foremost, the exception to the rule against hearsay would be the business record affidavit that we tendered for this item. Now, one of the known

---

[9]   Clement Pink represented Small at trial.

[10]   Maroun Khoutani was the State's prosecutor during trial.

> exceptions that's been established by the Supreme Court to confrontation clause issues is an ongoing emergency when it's being recorded for anything – for the non-primary purpose of a criminal investigation or prosecution. In this situation the reportee follows the defendant and reports the ongoing emergency and makes remarks, like, Oh, my God. I hope they're okay. I hope the person in the back of the trunk is okay. So I think that the exception to hearsay is met through purposes of the [business record affidavit] and then the confrontation issue, the exception of the ongoing emergency applies to this situation.

Pink: . . . The confrontation clause gives me a right to cross-examine her visual, her perception on why did she come to this conclusion. You can't just have someone say, Oh, it's a body. It's this, and allow that in through a witness that's – that doesn't have any knowledge of it.

The Court: I'll overrule. Do you have your business records affidavit?

Koutani: Absolutely, yes, ma'am.

The Court: Overrule the objections right now. I want the business reports [sic] affidavit. If you do have that, let's go that route first and then go from there. As of right now, I'm going to overrule the objection.[11]

To determine whether the admission of a 911 call violated Small's rights under the Confrontation Clause, we must first determine whether the statements in the call were testimonial. *See Davis*, 547 U.S. at 822; *Vinson v. State*, 252 S.W.3d 336, 338–39 (Tex. Crim. App. 2008). As noted, statements made during a 911 call

---

[11] Small does not appeal the admission of the business record affidavit. Small's first argument is based solely on the determination of whether the 911 call was testimonial or non-testimonial.

23

"under circumstances objectively showing that the primary purpose of the call was to enable police assistance for an ongoing emergency" are not testimonial. *Ramjattansingh*, 587 S.W.3d at 159 (citing *Cook*, 199 S.W.3d at 497–98) (relying on *Davis*, 547 U.S. at 822–23)); *see also Kinnett v. State*, 623 S.W.3d 876, 909 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) ("Statements made during 911 calls are typically considered nontestimonial because they are 'a cry for help' or 'the provision of information enabling officers immediately to end a threatening situation.'") (citing *Davis*, 547 U.S. at 832).

In *Davis*, the United States Supreme Court clarified the definition of "testimonial" for Confrontation Clause purposes:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 813-14. The Court enumerated four factors to consider in determining whether a statement is testimonial:

> (1) the caller spoke about events as they took place, rather than describing past events; (2) the caller requested assistance for an ongoing emergency, rather than providing a narrative report of crime

24

absent imminent danger; (3) the operator's questions and the caller's answers were necessary to resolve a present emergency, rather than to learn of past events; and (4) the frantic nature of the call and the issue of safety dominated over a sense of formal information gathering.

*Ramjattansingh*, 587 S.W.3d at 160 (citing *Davis*, 547 U.S. at 827). In *Davis*, which involved a 911 call made by a victim of domestic violence, the Court concluded the 911 call was not testimonial because the caller was "seeking aid, not telling a story about the past." 547 U.S. at 831.

Small argues that Creshell's 911 call was testimonial. He speculates without citation to any authority that the likelihood of an ongoing kidnapping emergency "was greatly diminished by the description of [Small's] reckless driving and by the fact that he stopped at a bar. Someone with a kidnap victim or dead body in their car surely would not draw attention to themselves by driving on the rim of his tire, swerving, and driving on to the median of a busy road in the late evening of New Year's Eve when law enforcement would be on the alert for drunk drivers." Small also argues that Creshell "did not seem excited—she told the dispatcher she was nervous but there was no tremor in her voice and her tone was even." When the officers arrived at the scene, Creshell told the officer to whom the dispatcher

25

transferred her, "I know there was a person getting in the trunk," and, "Please let them be O.K," but she spoke "calmly," during the call, according to Small.[12]

Small relies on *Hereford v. State*, 444 S.W.3d 346 (Tex. App.—Amarillo 2014, no pet.) in support of his argument that Creshell's statement was testimonial. In *Hereford*, an anonymous 911 caller reported that someone named Anthony Hereford was "dealing narcotics" at a specific hotel. *Id.* at 349. Neither the call nor a transcript was included in the appellate record, and it was unclear to the court of appeals when the call was made. *Id*. at 349, 351. Hereford objected to the admission of evidence of the 911 call as hearsay and violative of his rights under the Confrontation Clause. *Id.* at 349. The court of appeals held that the anonymous 911 call was testimonial, as there was an "absence of any indicia suggesting the presence of some emergency," and the purpose of the call was to develop "a factual predicate for later litigation" or to investigate a crime. *Id.* at 352.

Small identifies one discreet sentence in *Hereford* in support of his argument: "One cannot reasonably infer . . . that the caller was seeking help or was otherwise facing some immediate threat to his or her safety or well-being." *Id.* We do not interpret that sentence so narrowly as to require any non-testimonial 911

---

[12]  A review of the submitted audio recording reveals that while her voice was "even" during most of the call, Creshell sounded agitated at times, and she had to be told repeatedly to answer the officer's and dispatcher's questions.

call to be about danger to the caller, as opposed to immediate danger to someone else or the public at large. Indeed, caselaw says otherwise. *See, e.g., Michigan v. Bryant*, 562 U.S. 344, 363 (2011) (noting that "whether an emergency exists and is ongoing is a highly context-dependent inquiry" and discussing ongoing emergencies "that threaten[] the police and public"); *Ramjattansingh*, 587 S.W.3d at 161 (holding 911 caller's "report of a drunk driver on the road concerned the sort of ongoing emergency likely to render statements made in connection with it non-testimonial."); *Kearney v. State*, 181 S.W.3d 438, 442 (Tex. App.—Waco 2005, pet. ref'd) (holding 911 calls "are not given in response to structured police questioning or with an eye to [ ] future legal proceedings but are initiated by a victim *or witness* to obtain police assistance") (emphasis added); *Guzman v. State*, No. 02-18-00332-CR, 2019 WL 2223213, at *2, 4 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication) (holding trial court did not abuse its discretion in admitting 911 call made by caller who "heard someone get shot and had seen a guy run out of a neighboring apartment with a gun"); *Sissel v. State*, No. 03-19-00225-CR, 2021 WL 1112906, at *1, 7 (Tex. App.—Austin Mar. 24, 2021, no pet.) (mem. op., not designated for publication) (holding 911 call made by mother whose daughter heard disturbance at neighbor's apartment was non-testimonial and defendant's Confrontation Clause rights were not violated by admission of the call).

Moreover, *Hereford* is inapposite. First, there was no indication who made the 911 call or when it was made, and the call itself was not in evidence at trial. 444 S.W.3d at 349, 351. The only evidence in *Hereford* was testimony by the officers about what they were told of the call. *Id.* at 351. Second, the call, which reported a "specific person selling drugs at a specific location" was merely the "reporting [of] the occurrence of a crime, which crime the officers were subsequently dispatched to investigate," without "any indicia suggesting the presence of some emergency." *Id.* at 351–52.

In the present case, there was indicia of an emergency—a purported kidnapping. And an analysis of the *Davis* factors indicates the 911 call was not testimonial. First, Creshell described events as they took place and she followed Small's car, which she believed contained a body in the trunk, during the 911 call. Second, she requested assistance for what she perceived to be an ongoing emergency. Third, the 911 dispatch operator and the officer to whom she was transferred asked Creshell questions, the answers to which were necessary to resolve the present emergency of a potential active kidnapping. Fourth, while not "frantic," Creshell's statements during the call reflect that the issue of safety dominated over the issue of information gathering. She told the dispatcher, "It looks like someone just put somebody in the trunk of their car," "I'm scared to get up close," "Oh my God," "I was passing by and I see somebody's legs kicking and

28

he was trying to push them up into the trunk," "I know there was a person that was getting in the trunk," and "Please let them be O.K."

This Court used the *Davis* analysis in *Ramjattansingh.* In *Ramjattansingh,* a tow truck driver ("Wilson") called 911 and reported he was following a "drunk driver" who was "all over the road" and had nearly caused several accidents. 587 S.W.3d at 147. Wilson described the vehicle to the 911 operator and gave the license plate number. *Id.* Soon after the call, the driver who Wilson was following pulled off the road into a public parking lot. *Id.* Wilson agreed to stay in the parking lot with his lights flashing until law enforcement arrived. *Id.* The driver contended the trial court violated his Confrontation Clause rights by allowing the jury to listen to a recording of Wilson's 911 call. *Id.* at 159.

Applying the *Davis* factors, we held the 911 call was not testimonial. Rather, the call was made "mainly to enable a police response to an ongoing emergency." *Id.* at 160. Wilson requested police assistance to deal with the driver who was on the road; Wilson told the dispatcher the make, model, color, and plate number of the driver's car; and Wilson pulled into a parking lot after the driver and told authorities he would stay there with his flashers on until police arrived. *Id.* In sum, we held

> Wilson related events as they happened, reporting a drunk driver who was still on the road and posed an ongoing danger, his statements were for immediate police assistance were frequently made without prompting or in response to questioning, and were spontaneous and

concerned public safety. Each of the factors identified in *Davis* . . .
show that Wilson's 911 call was not testimonial.

*Id.* at 161.

*Cook* also dealt with a 911 caller who reported a drunk driver. 199 S.W.3d at 496. After another driver made an obscene gesture and threw a beer bottle at the caller's truck, the caller called 911 and told the operator that the other driver was drunk. *Id.* The recording of the 911 call was offered at trial but the caller did not appear as a witness. *Id.* We noted that, consistent with *Davis*, "Texas courts generally have looked to the degree of formality of a declarant's interaction with police, the purpose and structure of police questioning, and the likelihood that the declarant expects that the statements could be used in a criminal prosecution." *Id.* at 497–98; *see also Spencer v. State*, 162 S.W.3d 877, 882 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We held the trial court did not err in admitting the recording of the 911 call because the call concerned "a potential crime in progress," was initiated by the caller, was informal, and took place at the beginning of the police investigation. 199 S.W.3d at 498. We observed that "[s]tatements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Id.*; *see also Ruth v. State,* 167 S.W.3d 560, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating "we see nothing in the record suggesting that this call, in which a witness to a crime in

progress at her home summoned the police, deviates from the typical, nontestimonial 911 call").

As in *Ramjattansingh* and *Cook*, we conclude Creshell's statements during the 911 call were not testimonial. Creshell related events as they unfolded and she made them to enable police to respond to what she perceived was an ongoing emergency. *See Ramjattansingh*, 587 S.W.3d at 160–61; *Davis*, 547 U.S. at 827–28. Thus, Small's Confrontation Clause rights were not violated by the admission of the 911 call. We overrule Small's first issue.

### 2.    Denying the Motion to Suppress

Small argues the trial court erred in denying his Motion to Suppress evidence recovered from his car because the 911 call "did not provide the officers with sufficient information to rise to the level of reasonable suspicion to justify an investigative detention." He states that although Creshell "made herself accountable for the intervention, by providing her name and telephone number to the dispatcher," the officers did not speak to her or know anything about her when they detained Small. Small argues that the officers "did nothing to corroborate the caller's account of a possible kidnapping or dead body" before detaining Small at gunpoint, and that once he got out of his car with his hands up, the officers should

have opened the trunk "and immediately determined there was no one, alive or dead, in that trunk. That should have ended the investigative detention." [13]

The trial court conducted a hearing on Small's Motion to Suppress prior to trial. Small argued during the hearing that he should not have been arrested based on an anonymous tip. He argued he did not know how the "gun got on the scene." He argued:

> So any citizen accused, a lawyer, a doctor, a professor, a student that's led to believe that they may have done something wrong, I can pull my gun on you and I'm going to stop you and I can search your car because I believe you have committed a crime. That's not what the constitution is about. It's about having reasonable suspicions and intelligible suspicions that a crime has been committed[.] And in this case no body was found. We are not saying they didn't have a right to detain him, but they didn't have the right to arrest him. And they arrested him prior to anything being found.

Small asked the trial court to exclude the evidence of guns, videotape, "anything that is relating to this stop" as "fruits of a poisonous tree. It actually is coming in because he was illegally detained. Did they have a call? Absolutely, they had a call, Judge. Was it credible? Who says? But it [a victim] wasn't there."

---

[13]    During the suppression hearing, Officer Preston testified that the officers could not immediately open the trunk after stopping Small because they

> need[ed] to separate the defendant from the vehicle because if we attempt to have the defendant open the trunk while still in the vehicle, that provides him a means of egress. He could drive away. He can throw the vehicle in reverse and he could access a weapon while still inside the vehicle. So it would be important to separate him from where we believe the body may be.

The State argued that while the trial court and defense counsel may have disagreed with the force used to detain Small, the central question was whether the officers had "reasonable suspicion to believe that [Small] had been engaged in criminal activity and was that basis sufficient for them to conduct an investigation?" The State argued the officers had "reasonable suspicion to detain [Small] and search his vehicle for the crimes or evidence of the crime." When officers respond to a scene, the State argued, "we want them to be able to rely on information given by third parties because if they don't have that information and they're unable to investigate things like a body being stuffed in the back of a vehicle, there will arise an opportunity where a body is actually found in the back of a vehicle when it's too late."

We find *Navarette v. California*, 572 U.S. 393 (2014) is instructive. In *Navarette*, the Supreme Court considered whether information provided by an anonymous tipster contained sufficient "indicia of reliability" to justify an investigative stop. *Id.* at 397. In that case, the California Highway Patrol received a report from an anonymous caller that a silver Ford F–150 pickup truck traveling southbound on the highway had run the caller off the road. *Id.* at 395. A few minutes later, a highway patrolman encountered a truck matching the one described by the caller traveling in the direction reported. *Id.* The patrolman pulled the truck over and a second patrolman arrived on the scene. *Id.* As the

officers approached the truck, they smelled marijuana and a search of the truck bed revealed thirty pounds of marijuana. *Id.* The officers arrested the driver and passenger. *Id.* at 395–96. The driver and passenger moved to suppress the evidence, arguing the traffic stop violated the Fourth Amendment because the patrolmen did not have a reasonable suspicion of criminal activity. *Id.* at 396. The motion to suppress was denied and the suspects pleaded guilty to transporting marijuana. *Id.* The California Court of Appeal affirmed, holding the officer had reasonable suspicion to conduct the investigative stop. *Id.*

Though the record lacked any indication that the patrolman observed the pickup truck driving erratically, the Supreme Court held that the caller's tip contained adequate indicia of reliability to support a reasonable suspicion for a stop, given that it was based on eyewitness knowledge, was contemporaneously made, and was made to the 911 emergency system. *Id.* at 399–400. The Court noted that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Id.* at 401 (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The Court held that the traffic stop was proper because the conduct alleged by the 911 caller, "viewed from the standpoint of an objectively reasonable police officer, amount[ed] to reasonable suspicion" of drunk driving. *Id.* at 402 (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

*Pipkin v. State*, 114 S.W.3d 649 (Tex. App.—Fort Worth 2003, no pet.) also is illustrative. The salient issue in *Pipkin* was whether information relayed from a 911 caller to a police officer via police dispatcher "was sufficient to justify the investigative detention that led to [Pipkin's] arrest." *Id.* at 653. The caller in *Pipkin* reported a dark blue sports utility vehicle that was traveling at an "extremely slow" pace. *Id.* at 652. The caller passed the SUV as he was talking to the police dispatcher and saw the driver lighting a crack pipe. *Id.* at 653. The caller gave the dispatcher the SUV's license plate number, description, and location, as well as his own contact information and destination. *Id.*

An officer who was patrolling the area testified he received a call from dispatch about an erratic driver on the freeway. *Id.* The officer testified that he saw the vehicle and began following it, ultimately pulling it over. *Id.* The officer said he did not recall seeing any traffic violations by the SUV but stopped the vehicle based on the citizen's call about the driver smoking a crack pipe. *Id.* The officer approached Pipkin and asked if he had been smoking and Pipkin told him he "had smoked a joint earlier." *Id.* The officer asked Pipkin to get out of the SUV. *Id.* Another officer arrived and saw Pipkin throw a rock of cocaine to the ground. The police searched the SUV and found more cocaine, rolling papers, a glass tube, and a lighter in the center console of the SUV. *Id.*

35

Pipkin filed a motion to suppress the evidence found during the detention, arguing the detention that led to his arrest and the search and seizure of drug paraphernalia from his vehicle "was conducted without reasonable suspicion." *Id.* at 652. The trial court denied the motion. *Id.* The court of appeals observed that to make an investigative stop

> the investigating officer must possess a reasonable suspicion based on specific articulable facts that, in light of the officer's experience and general knowledge, would lead the officer to the reasonable conclusion that criminal activity is underway and the detained person is connected to the activity.

*Id.* at 653–54 (citing *King v. State*, 35 S.W.3d 740, 743 (Tex. App. —Houston [1st Dist.] 2000, no pet.)). The stop must be based on more than "mere hunch or suspicion." *Id.* at 654. Considering "the totality of the circumstances," the court held the information from the caller was "sufficiently reliable to justify the investigative stop[.]" *Id.* at 656. The court noted that the caller was a "private concerned citizen" not connected with the police; he gave the dispatcher a description of the SUV and its location and "personally watched and reported [Pipkin's] actions as he drove past" him; and gave the police department his contact information so he could be "held accountable for his intervention." *Id.* at 655. The court affirmed the trial court's denial of the motion to suppress. *Id.* at 656.

Small relies on *Florida v. J.L.*, 529 U.S. 266 (2000) for the proposition that an accurate description of a subject's location and appearance is reliable only to the extent it identifies the person accused by a tipster of a crime, but it does not show the tipster has knowledge of "concealed criminal activity." *Id.* at 272. But the tipster in *J.L.*, who alerted police that someone in a plaid shirt at a bus stop was carrying a gun, was anonymous and left the police without the ability to test his knowledge or credibility. *Id.* at 271. On the other hand, Creshell provided her name, a callback number, waited at the scene for law enforcement to arrive, and described what she believed to be ongoing criminal activity, all of which bolstered her credibility as an informant. Thus, *J.L.* is inapposite.

Small also relies on *Alabama v. White*, 496 U.S. 325 (1990), where a traffic stop was held to be justified, in asserting the evidence recovered during his traffic stop should be suppressed. *White* stemmed from an anonymous telephone tip that White would be leaving an apartment at a specific time in a specific vehicle and going to a specific motel in possession of cocaine. *Id.* at 327. The police went to the apartment, followed White in her vehicle, and stopped White just short of the motel. *Id.* The officers told White she was stopped for suspicion of cocaine possession and asked if they could look for cocaine. *Id.* White gave them permission to search and they found marijuana. *Id.* She was arrested and at the police station, the police found three milligrams of cocaine in White's purse. *Id.*

White pleaded guilty but appealed the denial of her suppression motion. *Id.* at 327–28. Alabama's Court of Criminal Appeals reversed the conviction, holding the officers did not have the reasonable suspicion required to justify the investigatory stop of White's car and the marijuana and cocaine were "fruits of [White's] unconstitutional detention." *Id.* at 328. The Supreme Court reversed, holding the investigatory stop of White's car was justified and noting the anonymous tip contained many details "relating not just to easily obtained facts and conditions existing at the time of the tip." *Id.* at 332 (quoting *Illinois v. Gates*, 462 U.S. 213, 245 (1983)). The Court noted the proposition "that because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." *Id.* at 331 (citing *Gates*, 462 U.S. at 244). *White* does not support Small's argument.

In the present case, when we view the record in the light most favorable to the trial court's ruling, as we must, we conclude the trial court's ruling denying the motion to suppress is supported by the record. *See Ruiz*, 577 S.W.3d at 545. The police testified during the suppression hearing that they would have treated any traffic stop based on a call about a kidnapping the same as Small's stop. The traffic stop was based on Creshell's 911 call, which provided detailed information about Small's car, his location, Creshell's identifying information and location, and

her belief that she was witnessing a kidnapping. She remained on the call for several minutes with the dispatcher while she followed Small and relayed his updated location, and she remained at the scene until the officers arrived. *See Pipkin*, 114 S.W.3d at 655 ("A detailed description of the wrongdoing, along with a statement that the event was observed firsthand, entitles an informant's tip to greater weight. . . . A tip also deserves great weight if the person put herself in a position to be held accountable for her intervention.") (citations omitted). When the officers arrived at the scene, the information Creshell provided was sufficiently corroborated given that Small was at the location she identified, and he was sitting in a parked car matching the description Creshell provided of a white, older-model sedan with a flat tire.

Under the totality of the circumstances, the information provided by Creshell was sufficiently corroborated and provided the officers with reasonable suspicion for the investigative stop. *See Navarette*, 572 U.S. at 402.[14] Thus, the trial court properly denied the motion to suppress. We overrule Small's second issue.

---

[14] The Supreme Court has recognized that reasonable suspicion "need not rule out the possibility of innocent conduct." *Navarette v. California*, 572 U.S. 393, 403 (2014) (citing *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

## Conclusion

We hold that the statements made on the 911 call did not violate Small's rights under the Confrontation Clause.  We further hold that the 911 call contained sufficient indicia of reliability so as to justify the investigative stop.

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).